George PABEY, Appellant/Cross–
Appellee (Plaintiff below),

v.

Robert A. PASTRICK, and the Lake
County Board of Elections and Regis-
tration, Appellees/Cross–Appellants
(Defendants below),

Lonnie Randolph, and A. Santos,
Appellees (Defendants
below).

No. 45S04–0401–CV–14.

Supreme Court of Indiana.

Aug. 6, 2004.

Rehearing Denied Aug. 24, 2004.

Bruce A. Kotzan, Indianapolis, IN, Nathaniel Ruff, Merrillville, IN, Carmen Fernandez, Hammond, IN, Attorneys for Appellant/Cross–Appellee (George Pabey).

Steve Carter, Attorney General of Indiana, Gary Damon Secrest, Chief Coun-

sel, Frances Barrow, Doug Webber, U–Jung Choe, Gordon White, Deputy Attorneys General, Attorneys for Amici Curai (Attorney General of Indiana).

George T. Patton Jr., Bryan H. Babb, Theresa M. Ringle, Indianapolis, IN, Attorneys for Appellee/Cross–Appellant (Robert A. Pastrick).

James L. Wieser, Schererville, IN, Attorney for Appellee/Cross–Appellant (Lake County Board of Elections and Registration).

DICKSON, Justice.

Plaintiff/appellant George Pabey is appealing from a judgment denying relief in an election contest. We reverse.

The primary election for the Democratic nomination for the office of mayor of the city of East Chicago, Indiana, took place on May 6, 2003. The candidates were incumbent Robert Pastrick and challengers George Pabey and Lonnie Randolph. The results of that election were:

|           |       |
|-----------|-------|
| Pastrick  | 4,083 |
| Pabey     | 3,805 |
| Randolph  | 2,289 |

At trial, Pabey sought to have all of the absentee ballots declared invalid or, in the alternative, to have the election invalidated and a new election ordered. Judgment for Respondent Robert A. Pastrick (hereinafter "Judgment") at 99.

Following careful consideration of extensive testimony in this election contest, Judge Steven King, regular judge of the LaPorte Superior Court and appointed by this Court as Special Judge to conduct these proceedings, issued a 103–page judgment that included comprehensive findings of fact and conclusions of law that are most impressive. We express our profound appreciation and admiration to the special judge for his excellent work, especially given the compressed time schedule that the Election Contest Statute requires and apparent efforts by some to interfere with the proceedings.

Of the 8,227 votes personally cast on election day, Pabey received 199 more votes than Pastrick. But of the 1,950 absentee ballots, Pastrick defeated Pabey by 477 votes, producing a 278–vote final victory for Pastrick. The trial court concluded that Pabey had proven "that a deliberate series of actions occurred" that "perverted the absentee voting process and compromised the integrity and results of that election." Judgment at 9. The judge found "direct, competent, and convincing evidence that established the pervasive fraud, illegal conduct, and violations of elections law" and proved the "voluminous, widespread and insidious nature of the misconduct." Id. at 92.

Notwithstanding the overwhelming evidence of election misconduct, however, Judge King was cautious regarding his authority to order a special election under the circumstances. He noted that "Indiana election law provides little insight into the appropriate remedy available in this proceeding. Case authority on election contests provides virtual[ly] no guidance for circumstances where widespread misconduct has impacted the absentee ballots cast in an election." Id. at 95. The judge perceived that he was not authorized by statute to order a special election because Pabey's evidence was only able to prove the invalidity of 155 actual votes, and because this was 123 votes short of the 278–vote difference that separated Pabey and Pastrick, Judge King reluctantly concluded that Pabey had failed to adequately establish that the proven deliberate series of actions "make it 'impossible' to determine which candidate received the highest number of votes." Id. at 100.

Perceiving his authority as a trial judge to be thus constrained, Judge King never-

theless noted that "relief from the May, 2003, primary election results lies in the province of the Indiana Court of Appeals or Supreme Court." Judgment at 99. In fact, he quoted from the Mississippi Supreme Court's decision in *Rogers v. Holder*, 636 So.2d 645, 650 (Miss.1994), as follows:

> Disenfranchisement of a significant number of voters may create sufficient doubt as to the election results to warrant a special election, even absent evidence of fraud. Invalidation of more than thirty percent (30%) of the total votes cast is generally sufficient to require a special election. *However, even where the percentage of total votes cast is small, if attended by fraud or willful violations of the election procedure, the Court will order a new election without reservation.*

Judgment at 98–99 (citations omitted, emphasis supplied in Judgment). Noting that 19.2% of the 10,177 total votes case in the East Chicago election came from 1,950 absentee ballots, of which 7.9% were invalidated, Judge King observed that the "Mississippi approach is appealing given the rampant election abuse that occurred here. The remedy of special election ... would serve the public's interest in the certainty of the election results at issue." Judgment at 3, 99.

We note that, while election procedures are normally matters for legislative determination, this Court declared almost seventy years ago:

> We are clear, however, that elections do not "belong to the *political branch* of government," if by that term is meant the legislative branch of the government. Elections belong to the sovereign people. The qualifications of electors and other matters concerning elections are prescribed by the Constitution. The Legislature may set up machinery for the conduct of elections, and delegate to ministerial or executive agencies the duty of conducting elections, and may prescribe the procedure by which elections may be contested, so long as they stay within their constitutional powers, and such procedure conforms to the law, such steps and procedure will be governed by the legislative rules prescribed. *But courts have inherent power to protect the sovereign people, and those who are candidates for office or claiming title to or rights in an office from fraud or unlawfulness....*

*State ex rel. Nicely v. Wildey*, 197 N.E. 844, 847, 209 Ind. 1, 8–9 (Ind.1935) (emphasis added).

Pabey initiated this appeal and sought emergency transfer to this Court under Indiana Appellate Rule 56(A). Transfer was denied with the effect that jurisdiction over the appeal remained in the Court of Appeals. Pastrick then filed a motion to dismiss the appeal for lack of jurisdiction. (Appellant, Pabey's Pet. to Trans. at 4). The Court of Appeals, over the dissent of Judge Baker, issued an order summarily granting Pastrick's motion to dismiss with prejudice. Pabey again sought, and this time we granted, transfer. *Pabey v. Pastrick*, —— N.E.2d ——, 2004 WL 1770562, 2004 Ind. Lexis 51 (Ind. Jan. 9, 2004).

### I

The Court of Appeals did not state its rationale for dismissing the appeal with prejudice. However, we found neither of the two grounds argued in Pastrick's motion to dismiss to have been persuasive and therefore granted transfer.

In his motion to dismiss, Pastrick argued that by not requesting preparation of the transcript of the evidentiary hearing and the exhibits introduced by the other parties, Pabey failed in his duty to present

a complete record as required by Indiana Appellate Rule 9(F)(4). (Appellee Pastrick's Br. in Resp. to Pet. to Transfer at 3–4). For that reason, he asked that the appeal be dismissed or, at a minimum, that Pabey be ordered to cause a transcript of the hearing to be prepared along with the exhibits of all parties.

Appellate Rule 9(F)(4) provides in relevant part:

> The Notice of Appeal shall designate all portions of the Transcript necessary to present fairly and decide the issues on appeal. If the appellant intends to urge on appeal that a finding of fact or conclusion thereon is unsupported by the evidence or is contrary to the evidence, the Notice of Appeal shall request a Transcript of all the evidence.

Pabey did not request that the court reporter prepare a transcript of the evidentiary hearing. In defense of his decision not to request a transcript of the evidentiary hearing, Pabey stated that no transcript was necessary because he "does not contend that these findings are unsupported by the evidence or that a conclusion is unsupported by the evidence or contrary to the evidence." (Resp. to Motion to Dismiss Appeal at 4). He argued that his specifications of error do not rely on evidence outside the trial court's findings. *Id.* Indeed, the Statement of the Facts in Pabey's brief states: "The Special Judge entered substantial and comprehensive findings of fact which Pabey adopts as his statement of the facts in this case." (Appellant's Br. at 4). Pabey then cites frequently to the court's findings throughout his brief. Pastrick does not identify any references in Pabey's brief to facts outside those found by the trial court.

*In re Walker*, 665 N.E.2d 586 (Ind.1996), is instructive in this regard. Transfer was granted in *Walker* "to encourage litigants and reviewing courts to employ efficient

appeal procedures." *Id.* at 588. The Court noted that the appellate rules in effect at the time required an appellant to transmit only those parts of the record that are necessary for review of the issues to be asserted upon appeal. *Id.* at 588. This Court addressed the merits of the appeal, even though no transcript had been filed as part of the record, where the appellants accepted the trial court's findings of fact and argued that those findings did not support the trial court's judgment. *Id.* at 588–89.

Even if Appellate Rule 9(F)(4) required Pabey to submit a transcript, dismissal with prejudice was not the appropriate remedy for his noncompliance with the rule. Former Appellate Rule 7.2(C) set out the procedure for modification or correction of an appellate record of proceedings, providing specifically that, "[i]ncompleteness or inadequacy of the record shall not constitute a ground for dismissal of the appeal or preclude review on the merits." *See Ben–Yisrayl v. State*, 690 N.E.2d 1141 (Ind.1997) (citing this language from the rule). That language was not carried over into the new appellate rules that became effective in 2001, but that omission was not intended to authorize dismissal of an appeal based merely on the incompleteness of the part of the record submitted to the appellate court. After all, the current Appellate Rule 49(B) provides that the failure to include an item in an appendix "shall not waive any issue or argument" and Rule 9(G) allows supplemental requests for transcripts to be filed.

■ Alternatively, Pastrick argued that the appeal should be dismissed because the trial court lost jurisdiction over the election contest due to its failure to hold a hearing within the time established by statute. (Appellee Pastrick's Br. in Resp. to Pet. to Transfer at 8). We reject Pas-

trick's premise that the trial court lacked jurisdiction.

It is true that in an election contest, "[t]he court shall fix a date within twenty (20) days after the return day fixed in the notice to the Contestee for the hearing on a contest." Ind.Code § 3–12–8–16. It has also been held that the failure to comply with the requirements of the election contest statutes generally requires dismissal. *See, e.g., English v. Dickey*, 128 Ind. 174, 27 N.E. 495 (1891) (right to contest election forfeited where contestor, without assigning reason therefor, requested and obtained postponement of hearing to date outside statutory deadline for hearing); *Smith v. King*, 716 N.E.2d 963 (Ind.App. 1999) (holding generally the same), trans. denied; *Kraft v. King*, 585 N.E.2d 308, 309–10 (Ind.Ct.App.1992) (petition for election contest did not comply with statute and thus failed to invoke jurisdiction of trial court).

In this case, however, Pastrick filed a motion to dismiss in the trial court on July 3, 2003. He argued that the trial court lost jurisdiction because the statutory deadline for the hearing was July 2. On July 15, the court denied Pastrick's motion to dismiss. The court noted delays in securing a judge to hear the case and pointed out that the special judge who ultimately tried the case was not appointed by this Court until June 30. Moreover, the court explained that given the special judge's obligations in his own courtroom, which had been fully scheduled through September, the special judge's distance from the court in which this case arose, and the many cases that had to be continued so that the special judge could hear this case, the election contest was heard as soon as practicable.

The trial court ruled that these circumstances, and the lack of any compelling indication that Pabey was less than diligent in moving the case forward, brought this case under an exception to the twenty-day deadline discussed in *State ex. rel. Arredondo v. Lake Circuit Court*, 271 Ind. 176, 391 N.E.2d 597 (1979). In *Arredondo*, the trial court set a hearing on an election contest petition for a date within, but near the end of, the twenty-day period allowed for by statute; yet a timely hearing could not be held because the contestor's motion for change of judge (filed ten days before the hearing deadline) was granted and the new judge did not qualify in time to conduct a hearing within the statutory period. 271 Ind. at 177–78, 391 N.E.2d at 598–99. The contestee objected to the new judge proceeding to hear the case beyond the twenty-day statutory period and filed an original action to prevent further proceedings. Denying the writ, this Court reasoned:

> To extend [*English v. Dickey*] to a fact situation such as the one at bar would, in our opinion, be grossly inequitable and place a great burden upon both an election contestor and the trial court. A hearing might initially be set near the end of the statutory time limit. If, then, the trial court either deliberately re-schedules the hearing beyond the limit or is forced to do so because of extraordinary circumstances beyond its control, a diligent and faultless contestor would forever be denied his statutory remedy. Our laws must provide a degree of flexibility to account for such situations. There can be no justification for closing the judicial doors to a bona fide litigant when the circumstances causing the delay are completely beyond his control.

271 Ind. at 178–79, 391 N.E.2d at 599. This Court concluded that when there are "extraordinary or unusual circumstances" that preclude a contest hearing from being conducted within the statutory twenty-day

period, "the trial court will not automatically be divested of jurisdiction so long as the hearing is had as soon as practicable after the time limit." 271 Ind. at 179, 391 N.E.2d at 599. "The contestor, of course, must be diligent in his efforts and must not utilize tactics to delay the hearing beyond the twenty-day period," the Court explained, but it also clarified that the contestor's motion for change of judge filed ten days before the statutory deadline did not itself prevent a timely hearing. 271 Ind. at 179, 391 N.E.2d at 599–600.

We agree with the trial court that *Arredondo* applies here. Moreover, it is unclear why Pastrick believes that his allegations of delay, even if true, require dismissal of the appeal. The trial court found the *Arredondo* exception applied, heard the election contest, and entered a judgment. No allegation has been made that Pabey's notice of appeal or appellant's brief was late under the applicable appellate rules.

For the same reasons, we reject Pastrick's claim on cross appeal that the trial court should have dismissed the election contest complaint as untimely.

## II

■ Pabey argues that "the pervasive fraud, illegal conduct, and violations of elections law" identified by the trial court, Judgment at 92, are sufficient as a matter of law to establish the requisite "deliberate act or series of actions occurred making it impossible to determine the candidate who received the highest number of votes cast in the election." Ind.Code § 3–12–8–2. Under the circumstances, he asks that the results of the primary election be vacated and a special election be ordered. (Appellant's Br. at 24).

The evidentiary hearing in the trial court spanned eight and one-half days and included the testimony of 165 witnesses. Among the findings and conclusions included in the trial court's judgment are the following:

> Petitioner George Pabey has satisfied his burden to establish that a deliberate series of actions occurred in the May 6, 2003 primary election to determine the Democrat nominee for the office of Mayor of the City of East Chicago, Indiana. Those actions perverted the absentee voting process[1] and compromised the integrity and results of that election.

Judgment at 9 (footnoted added).

> [Those] deliberate series of actions included *but are not limited* to the following:

1. Indiana Code § 3–11–10–24 provides that a voter who satisfies any of the following is entitled to vote by mail: (1) a voter who will be absent from the county on election day; (2) a voter who will be absent from the precinct of the voter's residence on election day because of service in certain statutorily-prescribed election day worker positions; (3) a voter who will be confined on election day to the voter's residence, to a health care facility, or to a hospital because of an illness or injury; (4) a voter with disabilities; (5) an elderly voter; (6) a voter who is prevented from voting due to the voter's care of an individual confined to a private residence because of illness or injury; (7) a voter who is scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls are open; or (8) a voter who is eligible to vote under Ind.Code § 3–10–11 [relating to persons who have moved not more than 30 days prior to the election] or Ind.Code § 3–10–12 [relating to persons who change residence from a precinct to another precinct do not notify the county voter registration office of the change of address before election day].

The trial court made a most important point in its Judgment in distinguishing between the statutory requirements for voting absentee by mail and voting absentee in person before an absentee voter board:

> It is emphasized ... that *without any reason,* any registered and qualified voter may cast an absentee ballot prior to election day

a) a predatory pattern exercised by Pastrick supporters of inducing voters that were first-time voters or otherwise less informed or lacking in knowledge of the voting process, the infirm, the poor, and those with limited skills in the English language, to engage in absentee voting;

b) the numerous actions of Pastrick supporters of providing compensation and/or creating the expectation of compensation to induce voters to cast their ballot via the absentee process. Those actions primarily—but not exclusively—involved the payment of money to voters to be present outside the polls on Election Day. The extensive evidence presented established that, at the least thirty-nine separate individuals ... fell within the ambit of those activities that engaged cash incentives to encourage absentee voting;

c) the actions of various Pastrick supporters who directed applicants for absentee ballots to contact that Pastrick supporter when the applicant received his or her absent[ee] ballot and, once called, to proceed to their home and, though not authorized by law to do so, "assist" the voter in completing the ballot;

d) the use of vacant lots or former residences of voters on applications for absentee ballots [2];

e) the possession of unmarked absentee ballots by Pastrick supporters and the delivery of those ballots to absentee voters;

f) the possession of completed and signed ballots by Pastrick supporters who were not authorized by law to have such possession;

g) the routine completion of substantive portions of absentee ballot applications by Pastrick supporters to which applicants simply affixed their signature;

h) the routine use of false representations—usually the indication that the applicant "expected" to be absent from Lake County on May 6, 2003—by those Pastrick supporters who filled out the substantive portions of applications and by votes solicited by Pastrick supporters to vote absentee to complete absentee ballot applications;

i) votes cast by employees of the City of East Chicago who simply did not reside in East Chicago; and

j) a zealotry to promote absentee voting that was motivated by the personal financial interests of Pastrick supporters and, in particular, city employees.

*Id.* at 9–11 (emphasis supplied in Judgment) (footnote added).

[T]he series of deliberate actions set forth in [the above items (a) through (j) ] implicate various state laws concerning absentee ballots [therein detailing various election and criminal laws implicated, including various violations constituting class D felonies].

*Id.* at 11–14.

It was common practice for those engaged in the Pastrick absentee voter efforts to deliver the completed absentee ballot applications that they acquired to the Pastrick campaign headquarters.

---

*in person* before an absentee voter board. I.C. § 3–11–10–26.
Judgment at 8–9. As the court observed, utilization of this alternative might well have "served to eliminate much of the mischief and fraud at issue" in this matter. *Id.* at 9.

**2.** An eligible voter who wishes to cast an absentee ballot by mail submits an "Application for Absentee Ballot" on a form prescribed by the Indiana Election Commission to the County Election Board. The Board then provides the voter with an absentee ballot. Judgment at 7–8.

There, the absentee ballot applications were photocopied. Thereafter the Pastrick campaign caused the original completed applications to be delivered to the offices of the Lake County Election Board in Crown Point, Indiana.

*Id.* at 15.

Rooted in the Pastrick campaign and its weekly exhortations in meetings with Democrat party precinct officials and city department heads to 'encourage' absentee voting, Pastrick confederates throughout the City of East Chicago in the three to four month period preceding May 6, 2003, engaged citizens in the absentee voting process. That absentee voter drive as played out in the testimony presented included criminal conduct by Pastrick supporters but, just as often, induced unwitting citizens to engage in criminal conduct or violate election laws.

*Id.* at 84.

[T]he commission of criminal acts by Pastrick supporters that included such activity as their unauthorized possession of completed ballots [a species of vote fraud defined by Ind.Code 3–14–2–16(4) and (5) ], the unauthorized possession of unmarked ballots [a species of "vote fraud" per Ind.Code 3–14–2–16(6) ], their presence while voters marked and completed their absentee ballots [a species of 'vote fraud' per Ind.Code 3–14–2–16(3) and a violation of Indiana Code 3–11–10–1.5], and the *direct* solicitation of a vote for cash all yielded absentee votes which respondent Pastrick concedes are invalid.

*Id.* at 84–85 (bracketed comments and emphasis in original).

The East Chicago Democrat mayoral primary may be a "textbook" example of the chicanery that can attend the absentee vote cast by mail: examples of instances where the supervision and monitoring of voting by Pastrick supporters and the subsequent possession of ballots by those malefactors are common herein. Those illegalities came with a side order of predation in which the naïve, the neophytes, the infirm and the needy were subjected to the unscrupulous election tactics so extensively discussed.

*Id.* at 89.

[I]t is apparent that a political subculture exists in Lake County which views the political machinations at issue with a "wink and a smile" and "business as usual."

*Id.* at 91.

The routine and cavalier use of "absence from Lake County" on election day, a reason often supplied and checked by the Pastrick supporter himself [as opposed to the registered voter] of the absentee ballot applications, is the common predicate to the most insidious and widespread of the abuse tactics exposed here: the predatory approach to the unwitting.

*Id.* at 91 (bracketed comments in Judgment). The appellate briefs filed on behalf of Pastrick do not challenge or dispute any of these findings.

The trial court was also cognizant of the difficulties faced by Pabey in discovering and presenting evidence to support his claims.

Given the voluminous, widespread and insidious nature of the misconduct proven, together with the sheer number of voters impacted by that misconduct, petitioner Pabey, his legal counsel, and amateur investigators faced a herculean task of locating and interviewing absentee voters, visiting multi-family dwellings and housing projects, gathering and combing through voluminous election documents, and analyzing, comparing, sifting and assembling the information

necessary to present their case.... In short, the time constraints that govern election contests, primarily designed to serve important interests and needs of election officials and the public interest in finality, simply do not work well in those elections where misconduct is of the dimension and multi-faceted variety present here.

*Id.* at 92–93. Commenting on the "reluctance [of] voters to candidly discuss the circumstances surrounding their absentee vote," the judge observed: "It is wholly natural, of course, that voters would be reluctant to expose themselves to potential criminal liability...." *Id.* at 93. The judge also noted that, in the course of the trial, several Pastrick supporters were involved in various attempts to influence or prevent witnesses' testimony, *id.* at 94, including instructing a witness to "feign a lack of knowledge on the witness stand." *Id.* at 87.[3]

Indiana law provides two methods to examine the results of elections: an election "recount" and an election "contest." *See* Ind.Code §§ 3–12–6–1 *et seq.* (recount) and 3–12–8–1 *et seq.* (contest). Pabey originally challenged the results of the primary under both of these statutes. However, he subsequently dropped his request for a recount and his recount petition was dismissed with prejudice. (Br. of Appellee, Pastrick at 2). As such, what is at issue in this proceeding is solely an election "contest" under Indiana Code § 3–12–8–1 *et seq.* We will refer to the election contest chapter of the Indiana Code as the "Election Contest Statute."

The Election Contest Statute provides that "[t]he court shall determine the issues raised by the petition and answer to the petition." Ind.Code § 3–12–8–17(b). As relevant to the issue before us, both section 2 of the statute, which prescribes the grounds upon which an election may be contested, and section 6, which designates the required content of a petition to contest an election, contain substantially similar language specifying that an election may be contested on the following grounds:

(1) The contestee was ineligible.

(2) A mistake occurred in the printing or distribution of ballots used in the election that makes it impossible to determine which candidate received the highest number of votes.

(3) A mistake occurred in the programming of a voting machine or an electronic voting system, making it impossible to determine the candidate who received the highest number of votes.

(4) A voting machine or an electronic voting system malfunctioned, making it impossible to determine the candidate who received the highest number of votes.

(5) A deliberate act or series of actions occurred making it impossible to determine the candidate who received the highest number of votes cast in the election.

Ind.Code § 3–12–8–2; *see also* Ind.Code § 3–12–8–6(a)(3). Pabey contested the results of the East Chicago mayoral primary pursuant to subsection (5), that is, that a deliberate series of actions had occurred

---

**3.** At the conclusion of the final judgment, the trial court noted that it had referred to Lake County Prosecutor Bernard Carter details regarding conduct of several specific Pastrick supporters who had threatened and/or otherwise attempted to influence testimony of witnesses in this case, and further noted that the court had taken "appropriate action" with respect to a Lake County judge who reportedly was indicating to prospective witnesses that they did not have to testify unless they had been paid a $20.00 witness fee. Judgment at 101–103.

that made it impossible to determine the candidate who had received the highest number of votes cast in the primary, to which we will refer hereafter as the "Deliberate Actions" ground.

The statutory language in the Deliberate Actions ground presents various difficulties in interpretation. It is not susceptible to literal interpretation and application. For example, the phrase "deliberate acts or series of actions" is unclear because it could be interpreted to mean conscious human behavior. In addition, the phrase "number of votes cast" literally includes both legal and illegal votes. Finally, the intended application and methodology prescribed by the phrase "impossible to determine" is not apparent from the text, and has never been construed by the appellate courts of Indiana. Because of these ambiguities, judicial construction is required.

■ While this Court has the inherent power to protect voters and candidates from election fraud and unlawfulness, *Nicely v. Wildey,* 197 N.E. at 847, the legislature "may set up machinery for the conduct of elections," *id.,* and we prefer to exercise our authority within the constraints of the Indiana Election Contest Statute.

■ The process of statutory construction is guided by well-recognized principles. "Our objective in statutory construction is to determine and effect the intent of the legislature." *Matter of Lawrance,* 579 N.E.2d 32, 38 (Ind.1991). We do not presume that statutory language "is meaningless and without a definite purpose" but rather seek to give effect "to every word and clause." *Combs v. Cook,* 238 Ind. 392, 397, 151 N.E.2d 144, 147 (1958). "Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute." *Hall Drive Ins, Inc., v. City of Fort Wayne,* 773

N.E.2d 255, 257 (Ind.2002). We must assume that the language employed in a statute was used intentionally. *Burks v. Bolerjack,* 427 N.E.2d 887, 890 (Ind.1981). We "will presume that the legislature did not enact a useless provision." *Robinson v. Wroblewski,* 704 N.E.2d 467, 475 (Ind. 1998). In interpreting a statute, we must seek to "give it a practical application, to construe it so as to prevent absurdity, hardship, or injustice, and to favor public convenience." *Baker v. State,* 483 N.E.2d 772, 774 (Ind.Ct.App.1985). When deciding questions of statutory interpretation, appellate courts need not defer to a trial court's interpretation of the statute's meaning. *Elmer Buchta Trucking, Inc. v. Stanley,* 744 N.E.2d 939, 942 (Ind.2001).

In addition, this Court has long held that statutes providing for contesting elections "should be liberally construed in order that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections." *Tombaugh v. Grogg,* 146 Ind. 99, 103, 44 N.E. 994, 995 (1896); *see also Hadley v. Gutridge,* 58 Ind. 302, 309 (1877).

The trial court noted that the statutory "deliberate act or series of actions" language does not require the conduct to be a species of "vote fraud," a criminal act, or otherwise proscribed by law. Judgment at 83. The legislature cannot have intended that *any* "act or series of actions" can trigger a special election. Of course, the conduct of every election campaign will involve an "act or series of actions" by candidates, political parties, and election officials alike. Standing alone, the phrase "act or series of actions" is ineffectual. The statute further requires that, to support an election contest and to justify a special election, the act or actions must be "deliberate." Ind.Code §§ 3–12–8–2(5), – 6(a)(3)(E). Used in this context, the noun "deliberate" means "[c]onsidered or

planned in advance with a full awareness of everything involved; premeditated" or "[d]one or said on purpose; intentional." *American Heritage Dictionary, Second College Edition* (1982) at 378. But such a qualification would likewise apply to the ordinary purposeful but lawful activities of candidates and political parties in the election process. Thus understood, the phase standing alone would lack any definite purpose and would be meaningless, contrary to the rules of statutory construction noted above.

The statutory language adds one further qualification, however. It requires that the deliberate acts or series of actions must result in "making it impossible to determine the candidate who received the highest number of votes cast in the election." Ind.Code §§ 3–12–8–2(5), – 6(a)(3)(E). Interpreting the phrase "deliberate act or series of actions" so as to have the purpose and meaning intended, we conclude that it requires the acts or series of actions to be deliberate in the sense of being purposeful in that the actor or actors knew or reasonably should have known that such conduct would "make it impossible" to determine the candidate receiving the most votes.

As to the phrase "votes cast in the election" used in the statute, the plain meaning demonstrates that the legislature meant to restrict this ground to votes actually cast and not to include potential votes that were not actually cast. However, by the word "votes," the legislature could not have meant it to include votes *illegally* cast. To impose such a meaning would render ineffectual the purpose of the statute. More than a century ago, this Court recognized that the "true gravamen of the case, whatever may be the ground of contest, is 'the highest number of legal votes.'" *Dobyns v. Weadon,* 50 Ind. 298, 302 (1875) (emphasis omitted). We hold

that the word "votes," as used in the phrase "highest number of votes," means *legal* votes.

The last and most challenging issue relating to the Deliberate Acts ground is the application and methodology intended by the phrase "impossible to determine." The trial judge focused on individual ballots to determine whether Pabey proved to a mathematical certainty that there existed a number of invalid votes cast that equaled or exceeded Pastrick's margin of victory. While recognizing the appeal of granting "some form of relief to petitioner, given the direct, competent, and convincing evidence that established the pervasive fraud, illegal conduct, and violations of elections law," Judgment at 92, the trial court believed:

> [A] court is not free to engage in speculation as to whether the will of the electorate has been served or to impose ... its *subjective* determination as to whether it is "impossible" to determine which candidate received the most votes in an election. Objective factors established by the evidence must guide that determination.

*Id.* at 97 (emphasis in original). The trial court declared 155 votes to be invalid but concluded "that those invalid votes were the result of a series of deliberate actions that do not make it impossible to determine which of the candidates" received the most votes. *Id.* at 101. This construction is unnecessarily restrictive and incorrect.

The last four grounds for a special election quoted above from section 2 and subsection 6(a)(3) of the Election Contest Statute each contain the "making it impossible" qualification. Of these four, clearly the last one, the Deliberate Actions ground, specifying conduct in the nature of purposeful behavior, is in stark contrast to the first three, which encompass inadvertent human error or device malfunc-

tion. This distinction is significant. The occurrence and resulting consequences of printing, distribution, or programming mistakes, or machine/system malfunctions, referred to in the prior three grounds are likely to be ascertainable with relative objectivity.

In contrast, the disruptive effects of deliberate conduct committed with the express purpose of obscuring the election outcome based on legal votes cast is likely to be more invidious and its results difficult to ascertain and quantify. Schemes that seek to discourage proper and confidential voting or that endeavor to introduce unintended or illegal votes into the outcome will inevitably produce outcome distortions that defy precise quantification. Furthermore, the grounds of mistake and malfunction are distinguished by the absence of deliberate human efforts to thwart true election results, and are generally not obscured by the material witnesses' self-interest or desire to avoid criminal self-incrimination. With its enactment of the Deliberate Actions ground in the Election Contest Statute, the legislature expressly intended to provide the remedy of a special election not merely for inadvertent mistakes and malfunctions, but also for deliberate conduct. In construing the language of these subsections, we must interpret and apply them in such a manner as to achieve the effect intended. As to the Deliberate Actions ground, the legislature could not reasonably have intended to immunize obviously corrupt elections where the resulting distortion of an election outcome could not be precisely traced and mathematically determined.

On the other hand, the mere occurrence of conduct by one or more persons who knew or reasonably should have known

that the conduct would make it impossible to determine the candidate receiving the most valid votes, but which deliberate conduct does not affect the outcome of an election, would be inconsistent with the language "makes it impossible to determine the candidate who received the highest number of votes" and thus cannot be a valid ground requiring a special election. We are convinced that this language was intended to require that the results of an election contested under the Deliberate Actions ground may not be set aside and a special election ordered unless the deliberate acts or series of actions succeed in substantially undermining the reliability of the election and the trustworthiness of its outcome.

■ We therefore hold that the burden upon a challenger seeking a special election under the Deliberate Actions ground in subsections 2(5) and 6(a)(3)(E) of the Election Contest statute is to conclusively demonstrate (a) the occurrence of an act or series of actions by one or more persons who knew or reasonably should have known that such conduct would make it impossible to determine which candidate receives the most legal votes cast in the election, and (b) the deliberate act or series of actions so infected the election process as to profoundly undermine the integrity of the election and the trustworthiness of its outcome.[4] A special election should be ordered only in rare and exceptional cases.

This methodology applies only to the "deliberate acts or series of actions" in subsections 2(5) and 6(a)(3)(E), but not to the same phrase as used based on mistakes and malfunctions stated in the grounds set forth in subsections 2(2)-(4)

---

4. Under these subsections, a contestor need not prove to a mathematical certainty that the number of invalid votes equaled or exceeded the contestee's margin of victory, but such proof would of course be sufficient to warrant relief.

and 6(a)(3)(B)-(D). The methodology utilized by the trial court here, requiring a mathematically sufficient number of resulting invalid ballots to be demonstrated, is appropriate to a proceeding under subsections 2(2)-(4) and 6(a)(3)(B)-(D) of the Election Contest Statute.

In the present case, the undisputed trial court findings establish the occurrence of a deliberate series of actions that "perverted the absentee voting process and compromised the integrity and results of that election." Judgment at 9. The court found that this scheme subjected "the naïve, the neophytes, the infirm and the needy" to "unscrupulous election tactics," *id.* at 89, that there was "convincing evidence that established the pervasive fraud, illegal conduct, and violations of elections law," *id.*, and that the misconduct was "voluminous, widespread and insidious." *Id.* at 92.

When as here an election is characterized by a widespread and pervasive pattern of deliberate conduct calculated to cast unlawful and deceptive ballots, the election results are inherently deceptive and unreliable. Widespread corruption of this nature has a high probability of producing untold improper votes and unreliable election results by coercing or intimidating citizens to vote in disregard of their own preferences and by manipulating them into voting when they would otherwise not vote at all. The effectiveness and breadth of such a scheme is inherently difficult to quantify. The opportunities for positive proof of individual ballot improprieties will inevitably be relatively few in comparison with the actual impact of such efforts.

The trial court findings abound with instances of concerted, purposeful efforts such as "a predatory pattern exercised by Pastrick supporters," Judgment at 9; "weekly exhortations in meetings," *id.* at 84; and "*direct* solicitation of a vote for cash," *id.* at 85 (emphasis in Judgment). As found by the trial judge, the deliberate series of actions in the campaign "compromised the integrity and the results" of the election. *Id.* at 9. The magnitude, pervasiveness, and widespread effect of the deliberate series of actions found in this case leads to but one conclusion. The Pastrick campaign certainly knew or consciously intended that the results of their conduct would so inhibit opposing votes and inject invalid favorable votes as to profoundly undermine the integrity of the election and the trustworthiness of its outcome. And this objective was clearly achieved. Given the exceptional facts and circumstances of this case, any other conclusion is inconceivable.

In view of the uncontested factual findings of the trial court, we conclude that Pabey has established that a deliberate series of actions occurred making it impossible to determine the candidate who received the highest number of legal votes cast in the election and that the trial court erred in denying Pabey's request for a special election.[5] While this remedy will be appropriate only rarely and under the most egregious circumstances, it is compelled by the facts of this case.

---

5. Indiana Code 3–12–8–17(e) specifies that a special election ordered in an election contest "shall be conducted in the precincts identified in the petition in which the court determines that ... the deliberate act or series of actions occurred." Because the statute requires the petition for an election contest to "identify each precinct *or other location* in which the act or series of actions occurred," Ind.Code § 3–12–8–6(c) (emphasis added), a special election may be generally ordered without limitation to specific precincts where, as here, the petition alleges that "the acts and series of actions ... occurred in each and every one" of the thirty-three (33) precincts in the City of East Chicago. Appellant's Appendix at 128.

## III

Pastrick contends that even if the actions found by the trial court to have occurred make it impossible to determine the candidate who received the highest number of votes cast in the election, a special election is not a permissible remedy. He points to the remedy section of the Election Recount Statute which provides:

(a) A contest shall be heard and determined by the court without a jury subject to the Indiana Rules of Trial Procedure.

(b) The court shall determine the issues raised by the petition and answer to the petition.

(c) After hearing and determining a petition alleging that a candidate is ineligible, the court shall declare as elected or nominated the qualified candidate who ·received the highest number of votes and render judgment accordingly.

(d) If the court finds that:

(1) A mistake in the printing or distribution of the ballots;

(2) A mistake in the programming of a voting machine or an electronic voting system; or

(3) A malfunction of a voting machine or an electronic voting system;

makes it impossible to determine which candidate received the highest number of votes, the court shall order that a special election be conducted under IC 3–10–8.

(e) The special election shall be conducted in the precincts identified in the petition in which the court determines that:

(1) Ballots containing the printing mistake or distributed by mistake were cast;

(2) A mistake occurred in the programming of a voting machine or an electronic voting system; or

(3) A voting machine or an electronic voting system malfunctioned.

Ind.Code § 3–12–8–17. The omission, Pastrick argues, from subsections (d) and (e), of any mention of "deliberate act or series of actions ... making it impossible to determine which candidate received the highest number of votes" indicates that the Legislature did not intend that a special election be a remedy under such circumstances.

Our analysis on this point requires a review of the legislative history of the Election Contest Statute and decisions of the Indiana Court of Appeals interpreting it. The modern form of the Election Contest Statute was enacted in 1986. It authorized eligible parties to contest elections on grounds of (1) irregularity or misconduct by election officials, (2) ineligibility of a candidate, and (3) "[m]istake or fraud in the official count of the votes." Ind.Code §§ 3–12–8–2, –6 (1986 Supp.). The Statute did not provide a special election as a remedy. *See* Ind.Code § 3–12–8–17 (1986 Supp.). In 1988, the first and third of those grounds were deleted such that the Election Contest Statute was apparently available only to contest elections on grounds of ineligibility of the candidate. 1988 Pub.L. 10, §§ 153, 155. The remedy section remained unchanged. *See* Ind.Code § 3–12–8–17 (1988). In 1989, the Statute was amended to authorize eligible parties also to contest elections on grounds that "a mistake occurred in the printing or distribution of ballots [making] it impossible to determine which candidate received the highest number of votes." 1989 Pub.L. 10, §§ 12, 13; Indiana Code § 3–12–8–2, –6 (1989 Supp.). The 1989 amendments also added a special election remedy for the first time but only in the precincts where the mistakenly printed or distributed ballots were cast. *Id.,* § 14; Ind.Code § 3–12–8–17 (1989 Supp.).

Despite the elimination of the grounds of irregularity or misconduct by election officials and mistake or fraud in the official count, an unsuccessful primary candidate in a 1991 primary election sought to file an election contest on those bases. The Court of Appeals held that, notwithstanding the 1989 legislative changes, a candidate could challenge an election based on fraud under the Election Contest Statute. *Hatcher v. Barnes,* 597 N.E.2d 974 (Ind. Ct.App.1992). It reasoned that "fraud of all kinds is abhorrent to the law, and if one person sustains injury through the fraud of another, courts have jurisdiction to afford a proper remedy" for fraud. *Id.* at 976. The court also stated that it did not know why the legislature took fraud out of the election contest statute, but that it was "convinced that [the Legislature] did not do so with any intention of precluding candidates from public office from a remedy if fraud indeed occurred." *Id.* at 977. *See also Kraft v. King,* 585 N.E.2d 308, 311 (Ind.Ct.App.1992) (Sullivan, J., dissenting).

*Hatcher* was the last word on the subject until 1999 when the Statute was amended in two places to authorize eligible parties also to contest elections on grounds that "[a] deliberate act or series of actions occurred making it impossible to determine the candidate who received the highest number of votes cast in the election" and to specify this as one of the grounds that may be included in a petition to contest an election. 1999 Pub.L. 176, § 100; Ind.Code § 3–12–8–2, –6 (1999 Supp.). In 2004, after this case had reached this Court, the legislature corrected an apparently inadvertent omission by amending section 17(d) of the Election Contest Statute to conform with subsections 2(5) and 6(a)(3)(E) which had been adopted in 1999, to expressly provide that a special election could be ordered in such circumstances. 2004 Pub.L. 14, § 161.

Based upon this history, we conclude that eligible parties are authorized to contest elections on grounds of intentional misconduct under the Election Contest Statute and that the court has authority to order that a special election be conducted where it finds that the occurrence of a deliberate act or series of actions makes it impossible to determine which candidate received the highest number of votes.

## IV

The Lake County Election Board by cross appeal challenges the trial court's determination that certain votes of the 155 absentee ballots cast in the primary are invalid because they had been cast by individuals "who applied to vote absentee by mail and made a false representation to the Lake County Election Board concerning the reason they were entitled to vote in that manner." Judgment at 87. There are 55 ballots that fall into this category. The Lake County Election Board contests the conclusion that these votes should not be counted.

We noted in footnotes 1 and 2, *supra,* several of the provisions of law applicable to this claim. Indiana Code § 3–11–10–24 provides that a voter who satisfies certain specified conditions is entitled to vote by mail. Among these conditions are the following: that the voter will be "absent from the county on election day; ... absent from the precinct of the voter's residence on election day because of service in certain statutorily-prescribed election day worker positions; confined on election day to the voter's residence, to a health care facility, or to a hospital because of an illness or injury; ... [is] an elderly voter; ... [or] is scheduled to work at the person's regular place of employment during the entire twelve (12) hours that the polls

are open." *Id.* A voter falling into one or more of these categories who wishes to cast an absentee ballot by mail submits an "Application for Absentee Ballot" on a form prescribed by the Indiana Election Commission to the County Election Board. The Board then provides the voter with an absentee ballot.

The County Election Board argues that the trial court erred in invalidating the votes in each of these 55 instances where the subject voter simply indicated on the ABS-1 Form of Application for Absentee Ballot that he or she would be absent from the County on Election Day, thus serving as a basis for Voting by Mail, when, in fact, the individual was not actually absent from the County on Election Day.

As discussed in Part II above, our ultimate resolution of this case does not rest on the mathematical comparison of votes invalidated to Pastrick's final victory margin. Instead, it rests on the trial court's unchallenged findings and conclusions of pervasive and widespread deliberate conduct that "perverted the absentee voting process and compromised the integrity and results of that election." Judgment at 92. The total number of absentee votes invalidated by the trial court is not determinative. Our conclusion is not altered whether the number of invalidated absentee ballots is 155 as found by the trial court, or 100, as urged by the Lake County Election Board.

## Conclusion

We reverse the trial court's determination denying a special election and remand to the trial court with directions to promptly order a special election by issuing a writ of election pursuant to Indiana Code § 3-10-8-3, and for all further proceedings consistent with this opinion. Any Petition for Rehearing must be actually received by the Clerk of Courts not later than ten calendar days following the date

of this opinion, notwithstanding provisions to the contrary in Indiana Appellate Rule 54(B).

SHEPARD, C.J., and RUCKER, J. concur.

BOEHM, J., dissents with separate opinion in which SULLIVAN, J., concurs.

BOEHM, J., dissenting.

I respectfully dissent. In my view, the controlling question is not whether election law violations occurred. The trial court found they did, and that finding was plainly supported by the evidence. But the central issue here is whether the corruption was the cause of the election result. The presence of corruption, even if "widespread," is no basis to upset an election and nullify the votes of the electorate if a majority of untainted votes supported the winning candidate. As the majority opinion spells out in some detail, the trial court found election law violations, and they were not limited to a few isolated instances. But the standard set forth in Indiana law for overturning an election it is that it is "impossible to determine the candidate who received the highest number of votes." Ind.Code § 3-12-8-2 (1999). The trial court, like the majority, read "the highest number of votes" to mean legitimate votes. The trial court, despite the portions of the judgment quoted by the majority, found that the plaintiffs failed to carry their burden of establishing that.

The trial court's finding, like any fact determination, is reversible only if clearly erroneous. *Infinity Prods. v. Quandt,* 810 N.E.2d 1028, 1031–32 (Ind.2004) (quoting *Bussing v. Ind. Dept. of Transp.,* 779 N.E.2d 98, 102 (Ind.Ct.App.2002), trans. denied). I believe that the trial court carefully analyzed these complex facts, and its finding is correct on this record. The trial court found the statute to require that

the plaintiffs establish, by a preponderance of the evidence, that the "deliberate acts" rendered it "impossible" to determine who got the most legitimate votes. I think that is the correct reading of the statute, and I believe it is the same reading the majority gives it. I also believe that reading makes sense. If corruption is widespread but has no effect on the election result, neither the public nor the parties should be put to the trouble of redoing the election. This does not mean the plaintiffs had to prove enough individual instances of unlawful votes to tip the election. It does mean that they needed to prove that the unlawful practices made it more likely than not that the result of the election, measured by lawful votes, was unknowable. There are a number of ways that a statistician might attempt to establish that it was a more probable than not that the deliberate acts affected the result. Here the trial court's judgment turned on its finding that there was no such showing. Neither plaintiffs nor the majority show how, on this record, the trial court was incorrect, much less clearly erroneous.

The majority concludes that it is irrelevant to the result here whether the trial court was correct in finding 155 invalid votes, rather than 100. I believe the trial court's calculations of invalid votes were excessively generous to the plaintiffs, and I do not agree that it is irrelevant. Fifty-five of the 155 ballots the trial court found invalid were defective only because they were based on an absentee affidavit that stated that the voter expected to be absent from the county on election day, but in fact the voter was in Lake County on that day. I believe it is common practice, and permissible, to vote by absentee ballot if there is any chance that voting on election day will not be possible. In today's commercial world, many people are unsure of their schedules and vote absentee to be sure they exercise their franchise, even if they

know they may indeed be present on election day. To be sure, others may abuse that privilege and vote absentee in order to work at the polls in another precinct, or for other less valid reasons. But as long as the voter votes only once, and in the precinct in which he or she is eligible, I would not disenfranchise that voter as the trial court did. The reason I believe this issue is relevant is that the conclusion that the legitimate votes are "impossible" to tally obviously turns on how close the election was. If over one third of the invalid ballots were in fact valid, it obviously affects the margin the plaintiffs need to overcome (increasing it from 278 to 333). But importantly, it also alters the percentage of irregular absentee ballots proven from 8.2% (155 of 1950) to 5.1%. It also increases the percentage of absentee ballots that were cast properly. The net result is, as the trial court found even without this adjustment, plaintiffs have not shown that the result of the election is more likely than not undetermined.

I also believe the majority's standard for judicial intervention in an election is problematic. The statute as written provides a relatively objective standard: are enough votes tainted that it is more likely than not that the result of the election, measured by lawful ballots, is unknown. The majority puts an essentially subjective patina on this test and calls for a new election whenever wrongdoing "profoundly undermines the integrity of the election and the trustworthiness of its outcome." This seems to me to invite courts to exercise essentially discretionary authority to alter election results that they deem undermined. Given that many Indiana trial judges are selected by partisan election, it seems an unwise expansion of the quite limited standard selected by the legislature, and one calculated to lead to claims of improper judicial interference with the electoral process.

The majority's reliance on *State ex rel. Nicely v. Wildey*, 197 N.E. 844, 209 Ind. 1 (1935) is misplaced. That case stated that elections do not "belong" to the legislature. *Id.* at 847–48, 197 N.E. 844. But neither *Nicely* nor any of the cases it cites for that proposition suggests that the legislature cannot prescribe processes for challenging election results. They do stand for the proposition that a writ of *quo warranto* may be a vehicle to challenge an officeholder's right to office, even if there are also statutory remedies. If it can be shown that the officeholder did not receive the most votes, he or she may be removed by that traditional common law writ proceeding, even if there are also statutory remedies that might be invoked. *See, e.g., State ex rel. Waymire v.Shay*, 101 Ind. 36, 37 (1885). But that does not suggest, as the majority implies, that the courts have unfettered authority to disregard legislative standards if, as here, a plaintiff invokes a statutory procedure. The election contest remedy provided by Indiana statute is specific in what must be shown and when it must be shown, and neither Mississippi case law nor Indiana precedent provides any basis for disregarding the statutory standards if a statutory challenge is raised. Moreover, if *quo warranto* had been attempted, it would require essentially the same showing that the statute demands for an election contest: proof that Pabey received the greater number of legitimate votes. As this Court put it in *Waymire*, "Whatever form the contest may assume, the pivotal question is, Who received the highest number of votes?" *Id.* at 38.

The difficulties the plaintiffs faced in proving their case were substantial, but are in my view no reason to upset an election. To be sure, plaintiffs here labored under severe constraints, but those constraints are imposed by statute and are designed to prevent judicial interference with electoral results except in the most extreme circumstances. Indiana law requires an election contest, as opposed to a recount, to be filed within seven days after the election. I.C. § 3–12–8–5 (1998). The matter is to be heard within twenty days after notice of a contest is served. I.C. § 3–12–8–16. This very short timetable undoubtedly imposes limits on the access to information and discovery that is available in more conventional lawsuits. But there is a very good reason why the election laws require this very expedited resolution of election disputes, even at the cost of sacrificing the court's normal opportunities for fact finding. There are many other remedies for the actions complained of in addition to setting aside an election. These include criminal prosecution of those who violate the law. As the entire nation painfully learned in the 2000 presidential contest, protracted election disputes leave the leadership and governance of the body politic in question. Upsetting an election thus visits a penalty on all citizens of the affected electorate, not just the wrongdoers.

In sum, the legislature has provided that the election stands if, after disregarding the votes shown to be tainted, there is no showing that the result is unknown. The majority cites authorities under other statutes that suggest a lower threshold of proof may be sufficient to overturn an election. I believe under our statutes Indiana courts have no business imposing a higher standard on the electorate. The trial court faithfully carried out the charge given to it by the legislature and found that the plaintiffs' case fell short of establishing the need for a new primary election. There is no doubt that the plaintiffs proved old-style election fraud in some cases, and highly inappropriate behavior in others. But our disapproval of the conduct of some of the participants in the

election is no basis to change its result without proof that the ultimate result was altered by the wrongdoing.

SULLIVAN, J. joins.