Phyllis GADDIS, David Brinkman and Cathleen Monaco, Appellants/Cross–Appellees,

v.

James McCULLOUGH, Brice Jones, Judy Whitaker, and John Davis, Appellees/Cross–Appellants.

No. 67A05–0409–CV–482.

Court of Appeals of Indiana.

May 10, 2005.

Transfer Denied Aug. 25, 2005.

Eric Koch, The Koch Law Firm, PC, Robert C. Price, Price & Runnels, Bloomington, IN, Attorneys for Appellants.

William R. Groth, Fillenwarth Dennerline Groth & Towe, Indianapolis, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Four unsuccessful candidates for town office in Cloverdale sought a recount and, when the recount did not change the election's outcome, sought judicial review to contest the results. The recount litigation originally contained multiple allegations of fraud, but by the time of trial the only remaining claim was that allowing three precincts to vote at one site and not separately tallying each precinct violated Indiana law. We affirm the trial court's judgment that the unsuccessful candidates showed no basis for altering the outcome of the election because there could be no doubt which candidates obtained the largest number of votes. Further, we remand to the trial court for assessment of trial and appellate attorneys' fees for raising frivolous claims.

### Facts and Procedural History

In 2003, James R. McCullough and John Davis were on the ballot as independent candidates for two at-large positions on the Cloverdale town council. Phyllis J. Gaddis and Frank Sweeney were on the ballot for the same two positions as Republican candidates. Judy G. Whitaker was on the ballot as an independent candidate for the Ward 1 position on the Cloverdale town council. David N. Brinkman ran for that position as a write-in candidate. Brice L. Jones was on the ballot as an independent candidate for the Ward 2 position on the Cloverdale town council. Cathleen Monaco ran for that position as a write-in candidate.

The 2003 municipal election in Cloverdale was administered by the Putnam County Election Board under contract with the Town of Cloverdale, as permitted by Indiana Code § 3–10–7–4. Three precincts include portions of Cloverdale, and each of the three also includes territory outside the town limits. For the 2003 municipal election, as for elections in the past, a single polling place was established at Cloverdale High School at which voters from all three precincts voted.

When the election board tallied the votes, they arrived at the following totals:

*At large (two elected)*

| | |
|---|---|
| John Davis | 215 |
| James R. McCullough | 211 |
| Frank Sweeney | 157 |
| Phyllis J. Gaddis | 155 |

*Ward 1*

| | |
|---|---|
| Judy G. Whitaker | 234 |
| David N. Brinkman | 128 |

*Ward 2*

| | |
|---|---|
| Brice L. Jones | 249 |
| Cathleen Monaco | 117 |

All four unsuccessful candidates petitioned for recount and contest.[1] In their verified petition, they alleged that the votes "were not correctly counted and returned" and "that fraud, tampering, or misconduct within the precincts specified was so pervasive that it is impossible for the Recount Commission to determine the approximate number of votes that each candidate received in that precinct." Appellant's App. p. 11.

In March 2004, all four unsuccessful candidates sought leave to file an amended petition for recount and contest, which the trial court later granted. The amended, verified petition added the allegations that

polling places were not open in two of the three precincts in Cloverdale and that "[t]he number of votes cast for the [successful candidates] in Cloverdale 1 precinct far exceed the number of signatures in the signature book for Cloverdale 1." *Id.* at 26. It further added the allegation that "[a] mistake occurred in the programming of the voting machine used in the election, making it impossible to determine the candidate who received the highest number of votes in each precinct. . . ." *Id.* at 29. The original verified allegations of fraud remained in the amended petition.

In response to the petition, the trial court ordered a recount, which was conducted on April 26, 2004. The recount commissioners were Charlotte Dudley, Marilyn Clearwater, and Kathy Evans. As a result of the recount, the vote totals for the two write-in candidates changed. Brinkman's total was reduced from 128 to 120. Monaco's total was reduced from 117 to 110. Except for the write-in votes, the election was conducted on touchscreen voting machines, which create no paper trail to be recounted. *See id.* at 48. Therefore none of the other vote totals changed as a result of the recount.

After the recount, the trial court held an evidentiary hearing. The unsuccessful candidates presented no evidence of any acts of fraud or deceit, nor did they present any evidence that any eligible voter was not allowed to vote or that any ineligible voter cast a ballot in the 2003 municipal election in Cloverdale. The respondents in the recount case, the four winning candidates, introduced interrogatory responses from each of the unsuccessful can-

---

1. A recount involves re-tallying of eligible votes and may result in a change in outcome of an election if the initial count was inaccurate. *See* Ind.Code § 3–12–6–22. A contest involves allegations that it is impossible to determine the true winner of an election be-

cause of errors in printing or distributing ballots, errors in programming or operating voting equipment, or election fraud. *See* Ind. Code § 3–12–8–2. The remedy in a successful contest proceeding is a new election. Ind. Code § 3–12–8–17.

didates in which they admitted that they had no evidence that any eligible voter was turned away, any ineligible voter was allowed to vote, or any other conduct falling within the common definition of election fraud occurred.

Rather, the unsuccessful candidates sought a new election based on allegations that the election was conducted contrary to law in two respects. First, they argued that the election board violated the law by having all three precincts vote at the same location. Second, they argued that the arrangement at the polling place—in which all electronic votes were tallied together rather than precinct-by-precinct—violated statutory requirements.

The trial court concluded that the unsuccessful candidates "failed to carry their burden of proof" to establish any of the statutory grounds for ordering a new election. The trial court entered judgment for the winning candidates. The winning candidates sought attorneys' fees, alleging that the unsuccessful candidates' claims were frivolous. Noting that the winning candidates presented "a strong basis" for their attorneys' fee claim, the trial court nevertheless denied it. *Id.* at 80.

One of the unsuccessful candidates, Francis Sweeney, has declined to participate in this appeal.

### Discussion and Decision

The unsuccessful candidates argue that the trial court erred by failing to order a special election because all three Cloverdale precincts voted in the same location and no precinct-by-precinct vote totals were captured. The winning candidates cross-appeal, arguing that the trial court erred in failing to sanction the unsuccessful candidates for frivolous claims. We address each claim in turn.

### I. Election Law Claims

 The unsuccessful candidates brought their action under the election contest statute, Indiana Code ch. 3–12–8. To succeed under the election contest statute, the unsuccessful candidates must do more than show technical irregularities in the election process. Rather, they must prove facts showing errors in the printing of ballots, errors in programming of voting equipment, voting equipment malfunctions, or "a deliberate act or series of actions" that "mak[e] it impossible to determine the candidate who received the highest number of votes." Ind.Code § 3–12–8–2. Technical violations of election law do not suffice to make out a claim under the contest statute unless they make it impossible to determine the winner of the election. *See id.* "[S]tatutes providing for contesting elections 'should be liberally construed in order that the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections.'" *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind.2004) (quoting *Tombaugh v. Grogg*, 146 Ind. 99, 44 N.E. 994, 995 (1896)), *reh'g denied.*

### A. Consolidation of Precincts

 First, the unsuccessful candidates argue that it was unlawful for all three Cloverdale precincts to vote in the same location in the 2003 town election. They rely on Indiana Code § 3–10–7–22(b): "If a precinct is wholly or partly in the town, the town election board may designate the polls for the precinct to be at the polls for an adjoining precinct, using the precinct election board of the adjoining precinct." They argue that this statutory language means that two precincts, but no more than two precincts, may vote at the same location. Appellants' Br. p. 12–13.

In construing statutes, we seek to execute the intention of the legislature, and

the plain words of the statute are the best indication of the legislature's intent. *BP Prods. N. Am., Inc. v. Bd. of Comm'rs of Lake County*, 812 N.E.2d 139, 143 (Ind.Ct. App.2004). The plain language of Section 22(b) does not support the unsuccessful candidates' argument. The statute applies to "a precinct." It permits "a precinct" to consolidate polling places with "an adjoining precinct." The unsuccessful candidates argue that "[t]he language is singular," meaning that once "a precinct" joins with "an adjoining precinct" once, it cannot do so again. Appellants' Br. p. 12. But under the rules laid down by the General Assembly for construing statutes, "[w]ords importing the singular number only may be also applied to the plural of persons and things." Ind.Code § 1–1–4–1(3). "It is a well-settled rule of statutory construction that words used in their singular include also their plural." *Medley v. Am. Econ. Ins. Co.*, 654 N.E.2d 313, 315 (Ind.Ct.App. 1995), *trans. denied*. The unsuccessful candidates ask us to read the words "only one" into the statute where "an" now appears, and we cannot do so under these settled principles of statutory construction. The plain language of the statute permits "a precinct" to have a joint polling location with one, or more than one, other precinct.

Moreover, permitting multiple precincts to vote in a single location is consistent with the statutory purposes of increasing convenience and reducing costs of town elections. *See Abney v. State*, 811 N.E.2d 415, 419 (Ind.App.2004) (stating that statute should be interpreted considering its objects and purposes), *adopted by* 821 N.E.2d 375 (Ind.2005). The relevant statute, Indiana Code § 3–10–7–22, applies only to towns with fewer than 3,500 inhabitants. In such locations, it is often more convenient and less costly to have a smaller number of polling places, and the statute should be read to foster those purposes. The text and purpose of Indiana Code § 3–10–7–22(b) do not support the unsuccessful candidates' overly restrictive interpretation of the statute.

■ Even if the unsuccessful candidates had prevailed on this legal point, the victory would not have entitled them to judgment in the election contest because it would not have placed the election's outcome in doubt. Allowing all three precincts to vote in the same location casts no doubt on the election's outcome and would not have "substantially undermin[ed] the reliability of the election and the trustworthiness of its outcome" in a manner leading to relief under the contest statute. *Pabey*, 816 N.E.2d at 1150.

### B. No Separate Vote Totals

■ Second, the unsuccessful candidates protest the fact that the three voting machines used in the Cloverdale town election were wired together to produce a single total of votes rather than three separate totals for the three precincts. The unsuccessful candidates have identified no statute that explicitly requires each precinct in a consolidated polling place to have a separate vote tally, so they rely on indirect references in other statutes to support their argument. *See* Appellants' Br. p. 5–7, 8 (citing references to "a precinct," "each precinct" or "one precinct" in Ind. Code §§ 3–12–6–1, 3–6–5–17, 3–12–4–10, 3–12–12–1, 3–12–12–9, 3–12–12–23, 3–12–11–1, 3–12–11–14 and 3–12–6–21.7).[2] The unsuccessful candidates are correct that the precinct is the basic level of electoral organization in Indiana, but no statute or other law supports their contention that a

2. At some points during this litigation, the unsuccessful candidates also argued that Indiana Code § 3–11–8–4.1 barred the siting of polls for all three precincts at the same location. They have abandoned that contention on appeal.

separate vote total invariably must be compiled for each precinct.

The unsuccessful candidates focus mainly on the statute allowing recounts in "one or more of the precincts in which votes were cast for the office," Ind.Code § 3–12–6–1, claiming that the statute authorizing a candidate to request a recount in a single precinct requires election officials to keep precinct-by-precinct vote tallies. Appellants' Br. p. 5. But this language simply does not command electoral officials to keep separate, precinct-by-precinct vote tallies when they have combined polling places under Indiana Code § 3–10–7–22(b). When precinct-by-precinct totals are not available, the candidate would have to avail herself of a recount in combined precincts. The unsuccessful candidates have not explained how this interpretation fails to accomplish the statutory purpose of the recount law or undermines electoral integrity.

■ Moreover, even if there were statutory support for their position, it certainly would not justify a judgment in their favor in an election contest. The failure to produce precinct-by-precinct totals does not "mak[e] it impossible to determine the candidate who received the highest number of votes," which is the standard in the contest statute.[3] Ind.Code § 3–12–8–2. Like the trial court, we have no trouble determining that the four individuals certified as winners by the recount commission obtained the most votes. As with the claim about consolidating precincts, the technical argument the unsuccessful candidates advance would not support a claim for a new election even if it were meritorious.

## C. Recount Commission Procedures

■ Third, the unsuccessful candidates argue that there should be a new election because the recount commission failed to adhere to procedures recommended by the State Recount Commission. *See* Ind.Code § 3–12–6–21(c) ("[T]he recount commission shall adopt procedures for conducting the recount, based as closely as is practical on the procedures adopted by the state recount commission."). The trial court found that this claim was waived because the unsuccessful candidates did not ask before the recount occurred that any particular procedures be followed. On appeal, the unsuccessful candidates do not address this finding. In the absence of any argument that the trial court's waiver finding was incorrect, this claim is forfeited on appeal. *Flowers v. Flowers,* 799 N.E.2d 1183, 1187 (Ind.Ct.App.2003); *see also* Ind. Appellate Rule 46(A)(8)(a) (stating that arguments must be supported by cogent reasoning and authority).

## D. Indiana Constitution

■ Finally, we address the unsuccessful candidates' argument based on the Indiana Constitution. Article 2, § 2 states that "[a] citizen of the United States who is at least eighteen (18) years of age and who has been a resident of a precinct thirty (30) days immediately preceding an election may vote in that precinct at the election." The unsuccessful candidates' argument based upon this language is not entirely clear; they state that "[l]egal votes only exist in their respective precincts," Appellants' Br. p. 11, and their position seems to be that failure to record votes in three separate precincts in Cloverdale violates the quoted constitutional language.

Our methodology for interpreting and applying provisions of the Indiana Constitution is well established. It requires:

---

3. The situation would be different if there were evidence that the total number of votes cast in the three precincts exceeded the number of voters who signed the poll books, but there is no such evidence.

a search for the common understanding of both those who framed it and those who ratified it. Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision. In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. In construing the constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy. The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

*City Chapel Evangelical Free, Inc. v. City of South Bend ex rel. Dep't of Redev.*, 744 N.E.2d 443, 447 (Ind.2001) (quoting *McIntosh v. Melroe Co.*, 729 N.E.2d 972, 986 (Ind.2000) (Dickson, J., dissenting) (quotations marks and citations omitted)).

The plain language of the constitutional provision does not support the unsuccessful candidates' reading. The provision only states that a qualified voter "may" vote "in" the precinct where the voter has resided. First, this language is permissive, leaving open the possibility that the voter may also vote elsewhere. Second, the plain words of the provision only govern where a voter may *vote*. The words of the section say nothing about where or how votes are to be tallied. Nothing in the plain language of the provision re-

quires the vote to be tabulated in any particular manner.

A truly literal interpretation of this language would invalidate many absentee ballots, which often are cast outside the precinct, not "in" the precinct. The unsuccessful candidates' literal interpretation of Article 2, § 2 also would render Indiana Code § 3–10–7–22 unconstitutional. If the Constitution mandates that voters cast ballots "in" their precincts, it would be unconstitutional for two precincts to vote in the same location. The unsuccessful candidates do not, however, argue that the statute is unconstitutional.

Nor does the history of the provision, which was amended to its current form in 1984, support the unsuccessful candidates' position. As originally ratified in 1851, the provision allowed a qualified voter "to vote in the *township or precinct* where he may reside." Ind. Const., art. 2, § 2 (West's Ann.Code, historical notes) (emphasis added).[4] The 1816 Constitution contained language similar to the 1851 Constitution, but it stated that qualified voters "shall be entitled to vote in the county" of residence. I Charles Kettleborough, *Constitution Making in Indiana* 107 (Ind. Historical Collection 1916). As initially drafted at the 1850 constitutional convention, the provision allowed voters to vote in their townships, and the reference to precincts was added during later deliberations. The only explanation in the debates for why the word "precinct" was added to "township" is that some precincts encompassed more than one township, so a voter might have to travel outside his township to vote. *Report of the Debates & Proceedings of the*

4. The unsuccessful candidates' focus on the framers' intent, *see, e.g.,* Reply Br. p. 7 ("The end the framers had in mind was that one only had a vote in one's precinct."), is misplaced. The 1851 Constitution permitted voting in a voter's township *or* precinct. The framers therefore did not intend that voters be restricted to voting in their precinct of residence.

*Convention for the Revision of the Constitution of the State of Indiana* 1292 (Ind. Historical Collection Reprint 1935) (remarks of Delegate Read).

The word "township" was eliminated from the section by an amendment passed by the voters in 1976. The statute by which the General Assembly approved the amendment described the amendment as "changing the age requirements for voting." *See* Public Law 1976–159 (approving proposed amendment). The primary substantive change in the amendment switched the voting age from twenty-one to eighteen; it was enacted in the aftermath of the Twenty–Sixth Amendment to the United States Constitution, which went into effect in 1971 and lowered the voting age in federal elections.[5] We have found no historic information about why the word "township" was dropped from Section 2 in the same amendment.[6] There is nothing in the historical record to support the unsuccessful candidates' argument that "[t]he privilege of voting is thus fundamentally grounded in a geographic area." Reply Br. p. 4. Since statehood, the language now found in Section 2 has changed several times, from "county" to "township," to "precinct," with no indication that any particular geographic reference has talismanic significance. In short, there is no historic evidence that the concept of "precinct" has special constitutional significance.

Nor does anything in the purpose and structure of our constitutional system hinge on the unsuccessful candidates' interpretation of "precinct" in our Constitution. The core principle of elections in Indiana is found in the Article 2, § 1: "All elections shall be free and equal." A variety of arrangements, some dependent upon voting in precincts and some not, could satisfy this overarching requirement. The hypertechnicality inherent in the unsuccessful candidates' arguments is contrary to the intent of our Constitution, which is to encourage exercise of the franchise. "In the absence of fraud actual or suggested election statutes should be liberally construed. We should at all times have before us the fundamental principle that no voter should be deprived of his franchise for the infringement of any technical requirements in casting his ballot." *Dobbyn v. Rogers,* 225 Ind. 525, 544–45, 76 N.E.2d 570, 582 (1948). This principle applies whether the technical error is committed by the voter or by voting officials, especially when there is no doubt as to the outcome of the election.

The unsuccessful candidates' argument that the Indiana Constitution mandates reversal of the trial court's judgment is unconvincing. The principle of "precinct" is not enshrined in our Constitution. Rather,

---

5. Contemporary journalistic accounts stressed that the amendment brought Indiana into line with the federal voting age. *See, e.g.,* Jan Carroll, *Hoosiers to Judge Only One Amendment,* S. Bend Trib., Oct. 31, 1976, at 19. These accounts also noted that the amendment limited the residency requirement for voting to thirty days in the precinct of residence because longer residency requirements of six months in the state and sixty days in the township in Section 2 were invalidated by *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). *Id.; see also* Editorial, *Amendment Noted,* Lafayette J. & Courier, Oct. 30, 1976, at 2 (election supp).

6. A 1984 amendment altered the language of Section 2 in non-substantive ways. The amendment included language changes in several sections of the Constitution, including the degenderizing of language throughout the document. *See* P.L. 383–1983 (titled as a resolution to amend the Constitution "updating certain antiquated style, language or provisions"). It appears to be designed to accomplish no substantive changes in the Constitution.

the important principle is to allow the will of the voters to be expressed freely, and the trial court vindicated that principle in this case.

None of the unsuccessful candidates' arguments is meritorious, and certainly none meets the high standard set by the election contest statute. We therefore affirm the trial court's judgment in favor of the winning candidates.

## II. Claim of Frivolousness

 The winning candidates ask this Court to reverse the trial court's judgment denying sanctions in the form of attorneys' fees despite its finding of "a strong basis" for their claim that the unsuccessful candidates' positions were frivolous and in bad faith. The winning candidates also ask this Court to award attorneys fees for frivolous and bad faith litigation. Under Indiana Code § 34–52–1–1(b),

[I]n any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

Also, under Indiana Appellate Rule 66(D), "[t]he Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees."

[A] claim or defense [is] frivolous (a) if it is taken primarily for the purpose of harassing or maliciously injuring a person, or (b) if the lawyer is unable to make a good faith and rational argument on the merits of the action, or (c) if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. A claim or defense is unreasonable under the statute, if, based on a totality of the circumstances, including the law and the facts known at the time of the filing, no reasonable attorney would consider that the claim or defense was worthy of justification. Finally, we determined a claim or defense to be groundless if no facts exist which support the legal claim relied on and presented by the losing party.

*N. Elec. Co., Inc. v. Torma,* 819 N.E.2d 417, 430–31 (Ind.Ct.App.2004) (internal citations omitted), *reh'g denied.* In reviewing the trial court's decision not to award sanctions, we determine whether any factual findings are clearly erroneous; we review *de novo* relevant conclusions of law; and we review the ultimate decision whether to award attorneys' fees for abuse of discretion. *Inlow v. Henderson, Daily, Withrow & Devoe,* 804 N.E.2d 833, 839 (Ind.Ct.App.2004).

We reverse the trial court's judgment denying attorneys' fees to the winning candidates, and we award them appellate attorneys' fees in addition, because there is no reasonable or well-grounded basis for the unsuccessful candidates' claims under the election contest statute. None of the unsuccessful candidates' arguments, even if they had prevailed, would have met the well-established standard for obtaining relief under Indiana Code § 3–12–8–2. There is no good faith or rational argument supporting the unsuccessful candidates' claim for a special election. Also, the special circumstances of election-related litigation make us particularly sensitive to the potential for frivolous litigation.

To prevail in their contest action, the unsuccessful candidates were required to

show that it was "impossible to determine the candidate who received the highest number of votes" as required by Indiana Code § 3–12–8–2 to order a special election. It has long been the law that "the real subject of the contest is the highest number of legal votes," not "the malconduct of the officers" conducting the election. *Dobyns v. Weadon*, 50 Ind. 298, 302–03 (1875) (applying earlier version of contest statute). This standard has been applied as recently as last year in *Pabey*, 816 N.E.2d at 1150 (holding "that the results of an election contested . . . may not be set aside and a special election ordered unless the deliberate acts or series of actions succeed in substantially undermining the reliability of the election and the trustworthiness of its outcome").

None of the evidence or arguments the unsuccessful candidates advanced could have met this standard. All along, Cloverdale's voters' preferences were clear, as the winning candidates prevailed by substantial margins. The unsuccessful candidates cast no doubt on the outcome of the election and failed to show that anyone involved in the process—candidates or election officials—acted in anything other than good faith. The arguments the unsuccessful candidates raised were technical, and technical arguments are simply insufficient to meet the standard of the contest statute when they do not cast doubt on who won the election.

Furthermore, the technical arguments the unsuccessful candidates made never called the election's outcome into question. The argument that the polling places should not have been consolidated did not call the election's outcome into question, and the unsuccessful candidates introduced not one iota of evidence indicating that the consolidation had any effect on turnout or discouraged even a single voter from going to the polls. The argument that the precincts should not have been counted together also did not call the election's outcome into question, and the unsuccessful candidates introduced no evidence to raise any question about the accuracy of the vote count or to cast doubt on the honesty of the vote counters. The unsuccessful candidates' constitutional argument also cast no doubt on the outcome of the election.

That the unsuccessful candidates never truly contested the result of the election is well illustrated by the their failure to eliminate allegations of fraud from their complaint after finding no evidence supporting those allegations. When asked in discovery to set forth facts supporting their verified allegations that there was "fraud, tampering or misconduct" satisfying the contest statute, the unsuccessful candidates uniformly answered that "[t]he phrase 'fraud, tampering or misconduct' is statutory language" then went on to state their legal theories. Appellees' App. p. 17, 23, 31, 40. They answered similarly when asked to describe who committed the "fraud, tampering or misconduct" and what "deliberate acts or series of acts of misconduct" infected the electoral process. *Id.* at 17–18, 24–25, 32–33, 40–41. The unsuccessful parties thus incanted the required statutory language while admitting that they lacked evidence to show that the statutory standard was met. Instead of attempting to meet the statutory standard by showing acts making it impossible to determine who received the most votes, they substituted legal theories that could not meet the standard.

In short, the unsuccessful candidates alleged violations of two provisions of election law, but they fail to show how they or anyone else was harmed by the alleged violations. They failed to prove that, had the election been conducted as they believe it should have been, the outcome might

have been different. They also failed to prove that it is impossible to determine who really won the election. They have produced no evidence that the conduct of the election disenfranchised a single voter. In short, they have not shown that the violations they allege harmed anyone.

 Because "no practical consequences" flow from the errors the unsuccessful candidates allege, "there is no substance to [their] claim." *D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898, 901 (Ind.2003). Courts will not intervene "where no significant injury is inflicted, at least for unintentional wrongs, or ... where the process complained of is out of specification but in the end produces the same result that would have emerged from strict conformance." *Id.* This quotation precisely describes the situation in this case. The unsuccessful candidates allege that the precincts should not have voted together and the votes should have been counted precinct-by-precinct, but they have produced no evidence to show that these alleged problems affected the outcome of the election or harmed them or any other voter in any way.[7]

In concentrating on the technicalities of the statutes they rely on, the unsuccessful candidates lose sight of the purpose of the recount and contest statutes—to ensure a fair, transparent election in which the individual with the greatest number of votes wins.[8] The unsuccessful candidates have produced nothing to show that the 2003 Cloverdale town election was anything other than fair, transparent, and correct in its result.

Our decision is bolstered by the litigation's special context in the electoral process. When unsuccessful candidates pursue frivolous claims, public confidence in the electoral process may suffer. This proposition is especially true in circumstances such as these, where there can be no reasonable doubt as to whom the citizens selected as winners in the election. Also, frivolous claims may be particularly pernicious in the electoral context because of the costs they impose on citizens—such as the winning candidates in this case—who choose to seek elected office. There is no allegation in this case that the winning candidates did anything wrong. Rather, any errors in administering the election were committed by election offi-

---

7. The unsuccessful candidates' inability to show that they were harmed by the alleged illegalities in the election process also can be viewed from the perspective of standing doctrine. "To establish standing, a plaintiff must demonstrate that he or she has sustained, or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue." *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 714 (Ind.Ct.App.2004). "[F]undamentally, standing is a restraint upon this Court's exercise of its jurisdiction in that *we cannot proceed where there is no demonstrable injury to the complainant before us.*" *Pence v. State*, 652 N.E.2d 486, 488 (Ind.1995) (emphasis in original), *reh'g denied*. This doctrine arises from separation of powers concerns and restrains the judicial branch from intruding into the domains of the other branches by issuing advisory opinions. The public standing exception to ordinary stand-

ing principles also would not avail the unsuccessful candidates. The public standing doctrine allows litigation to go forward to enforce certain public rights and duties when the plaintiff's injury is no greater than that of any member of the general public, but a redressable injury is still required. *Embry v. O'Bannon*, 798 N.E.2d 157, 159–60 (Ind.2003).

8. Because we conclude that the unsuccessful candidates are entitled to no relief, we need not address the winning candidates' argument that technical violations of election laws that might serve as the basis for judicial relief *before* an election can only support judicial relief *after* an election if the violations cast the outcome in doubt. Appellees' Br. p. 15 (citing *Schafer v. Ort*, 202 Ind. 622, 177 N.E. 438, 440 (1930)).

cials who are not parties to this case and bear none of the costs.[9] The winning candidates sought the opportunity to perform public service for their community, presumably for little compensation; moreover, as independent candidates the winning candidates are not supported by a political party that might assist with litigation expenses. Requiring the winning candidates to shoulder all of the costs of defending a frivolous appeal is a disincentive to individuals contemplating a run for public office.

The argument for appellate attorneys' fees is even stronger because the unsuccessful litigants persisted despite the trial court's warning of the futility of their cause. The unsuccessful candidates should have heeded the trial court's alert that there was a "strong basis" for sanctions in the trial court. Trial courts rarely provide such warnings. The trial court spelled out clearly for the unsuccessful candidates the problems with their claim. It indicated that the unsuccessful candidates "failed to carry their burden of proof" because they "presented no evidence of any misconduct, fraud or tampering of any sort" and "presented no evidence of any deliberate act or series of actions which occurred to make it impossible for the Election Board ... or for the Recount Commission ... to determine which candidates received the highest number of votes cast." Appellants' App. p. 78–79. The trial court thus indicated to the unsuccessful candidates that their claim was misconceived because, whatever might be the strength of their technical statutory challenges, they could not meet the burden set by the election contest statute to show that it was impossible to determine who won the election.

We affirm the trial court's judgment on the merits, reverse the trial court's judgment regarding sanctions for frivolous litigation, and remand this matter for the award of attorneys' fees for trial and appellate proceedings.[10]

Affirmed in part, reversed in part, and remanded.

KIRSCH, C.J., and NAJAM, J., concur.

---

9. Under the relevant statutes, the winning candidates are "contestees" and therefore proper parties to the litigation. Ind.Code § 3–12–8–10.

10. Francis Sweeney, who was a party in the trial court but not on appeal, should be responsible for attorneys' fees only in the trial court.