ATTORNEYS FOR RELATOR
Kevin P. McGoff
Rafael A. Sanchez
Margaret M. Christensen
Indianapolis, Indiana


ATTORNEYS FOR AMICUS CURIAE, DISCIPLINARY COMMISSION
Donald R. Lundberg
Angie L. Ordway
Indianapolis, Indiana

ATTORNEYS FOR RESPONDENTS
Ronald E. Elberger
Suzanna Hartzell-Baird
Indianapolis, Indiana



FILED
Apr 14 2010, 2:04 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

_____

No. 94S00-0810-MS-551

STATE OF INDIANA EX REL.
INDIANA STATE BAR ASSOCIATION,

*Relator*,

v.

UNITED FINANCIAL SYSTEMS CORPORATION,
RICHARD FOLLETT, JAYNE A. FOLLETT,
RICHARD L. FOLLETT II, BEAU R. FOLLETT,
JODY WAUGH, RAYMOND C. PHILLIPS,
LINDA DISHONG, L. KAY LARSON, JOHN JOYCE,
GARY LOVELADY, SHARON DORSEY, SHERRY
JORDAN, DOUGLAS J. LALAMA, ANDREW MARK
EADS, KATIE JACKEL, AND JAMES BOYLES,

*Respondents*.

_____

On Petition to Enjoin the Unauthorized Practice of Law
_____

**April 14, 2010**

**Per Curiam.**

This is an original action brought by the Indiana State Bar Association ("ISBA") in the name of the State of Indiana pursuant to Indiana Admission and Discipline Rule 24, alleging that United Financial Systems Corporation and numerous individual respondents (collectively, "UFSC")[1] have engaged in the unauthorized practice of law in Indiana. The ISBA seeks an order (1) enjoining UFSC from the unauthorized practice of law, (2) requiring UFSC to disgorge fees collected for unauthorized legal services, and (3) compelling UFSC to pay various fees, costs and expenses, including reasonable attorney fees.

This Court has exclusive jurisdiction over matters involving the unauthorized practice of law. *See* Ind. Const. art. 7, § 4; *see also* Ind. Code § 33-24-1-2. As set forth in more detail below, we find that UFSC has engaged in the unauthorized practice of law and that an injunction prohibiting such conduct should issue. Although the phrase "costs and expenses" under Rule 24 does not include attorney fees, the ISBA nevertheless is entitled to certain statutory attorney fees. Finally, disgorgement of fees is warranted to the extent described below.

## I. Procedural Background

On October 9, 2008, the ISBA filed a verified petition alleging that UFSC engaged in the unauthorized practice of law. After verified returns were filed by several respondents, the Honorable Bruce C. Embrey was appointed by agreement of the parties to act as Commissioner to hear the evidence and provide the Court with findings of fact. Following an evidentiary hearing spanning three days and the submission of briefing and proposed findings by the parties, Judge Embrey issued his Report of the Commissioner ("Report") on July 13, 2009. We commend Judge Embrey for the thoroughness of his Report, which has greatly aided us in the exercise of our original jurisdiction.

---

[1] The ISBA entered into settlement agreements with respondents Douglas Lalama, Linda Dishong, Kay Larsen, Katie Jackel and Andrew Eads, who agreed to a permanent injunction. We approved the agreements and those particular respondents were dismissed from this action. Our opinion today is directed toward the remaining respondents.

The Court received further briefing from the parties and from the Disciplinary Commission, which was granted leave to appear as *amicus curiae*. Oral argument then was heard on the issues of disgorgement and attorney fees.

## II. Findings of Fact[2]

A.  <u>UFSC's business model</u>

UFSC is an insurance marketing agency. The principals of the company and the various entities comprising its corporate structure are members of the Follett family. In 1995, UFSC began to market and sell estate planning services, including wills and trusts. The company is headquartered in Indianapolis and does business in Indiana and twelve other states. In Indiana, from October 2006 through May 2009, UFSC sold 1,306 estate plans from which the company grossed over $2.7 million. (Report at 2-3, ¶ 1.) During roughly this same period of time, 0.09% of UFSC's total nationwide income and 18.8% of UFSC's nationwide fee income was derived from the sale of estate planning services in Indiana. (Id. at 2.)

The business practices at issue in this case occurred as follows. UFSC targeted and then mailed prospective clients (generally retirees) information on how to avoid probate. For those who responded, as well as some existing UFSC clients, a UFSC sales representative (either an Estate Planning Assistant or a Health Planning Assistant) met with the client and gained access to his or her financial information, which the company separately used later in an effort by its Financial Planning Assistants to sell insurance products. The presentation made by the Estate Planning Assistant or the Health Planning Assistant to the prospective client touted UFSC's team of tax strategists, financial consultants, independent attorneys, and Medicaid and estate planning assistants. In reality, UFSC has no tax strategists. (Report at 3-4, ¶¶ 3-7.)

---

[2] UFSC disputes several findings of fact made by the Commissioner. In our order scheduling briefing in this matter, the parties were advised that the Commissioner's findings would be reversed only if found to be clearly erroneous. *See* <u>GKN Co. v. Magness</u>, 744 N.E.2d 397, 401 (Ind. 2001) (indicating that where a trial court conducts an evidentiary hearing, we give its factual findings deference and reverse only if the findings are clearly erroneous). Having reviewed the record, we find ample support for the material findings of fact challenged by UFSC, and do not address UFSC's factual disputes individually.

The Estate Planning Assistant or Health Planning Assistant received a commission on sales of wills and trusts, and the Assistant's presentations pushed the most expensive plan. The cost of this plan, which included a will, trust, powers of attorney, deeds, and the promise of future amendments as needed, was $2,695 in 2009. The commission from each sale of this plan ranged from $750 to $900. (Report at 38, ¶¶ 91-92.) The Estate Planning Assistants and Health Planning Assistants were not licensed attorneys and were not directly supervised by an attorney. The Financial Planning Assistants likewise were not attorneys. (Report at 5, 21, 36, ¶¶ 9, 30, 85.)

Once a sale was made, the Estate Planning Assistant or Health Planning Assistant secured full or partial payment from the client on the spot.[3] The forms containing the client's personal and financial information were routed to UFSC's in-house counsel, David McInerney, who then provided the information to one of the panel attorneys with whom UFSC has contracted. The estate plans sold by UFSC throughout the country were all processed in Indianapolis and routed to panel attorneys in Indiana and other states to draft documents for the plans. (Report at 5, 40, ¶¶ 10, 97.)

Upon receiving a client's information, the panel attorney called the client, knowing the client had already paid for a certain estate plan. (Report at 5-6, ¶ 11.) UFSC insists that the panel attorneys had the freedom to exercise their own independent judgment in ensuring that the client had an estate plan suitable for his or her interests. Notably though, of the 1,306 estate plans sold in Indiana from October 2006 to May 2009, only nine of these clients downgraded to a less expensive plan following consultation with a panel attorney. Further, because a panel attorney was paid a flat fee of only $225 for drafting the estate planning documents, any consultation between the panel attorney and the client above and beyond the initial phone call generally was not financially feasible. (Report at 6, ¶¶ 12-13.)

---

[3] UFSC's training materials instruct the Estate Planning Assistants and Health Planning Assistants how to overcome clients' objections to immediate payment, such as apprehensiveness about the cost, requests to "think it over" or "discuss this with my children," or a desire to consult with a lawyer (which the training materials characterize as "by far the most frustrating objection"). (Report at 39, ¶ 96; ISBA Exh. 8, pp. 1609-21.)

4

The documents prepared by the panel attorney were then sent back to UFSC and bound. A Financial Planning Assistant was paid $75 to deliver the documents and assist the client in executing them. The Financial Planning Assistant, who was compensated primarily through commissions from the sale of insurance products, then endeavored to sell the client insurance products based on the financial information provided by the client. UFSC imposed sales quotas on its Financial Planning Assistants, who were expected to generate a weekly average of at least $75,000 in annuity or life premium sales. (Report at 7, ¶¶ 15-16.)

UFSC has structured its business such that the Estate Planning Assistants, Health Planning Assistants, Financial Planning Assistants and the panel attorneys are considered by UFSC to be independent contractors. (Report at 3-4, ¶ 5.) However, all of these persons are essential to UFSC's core business model. UFSC loses money on the sales made by the Estate Planning Assistants and Health Planning Assistants, because the cost of developing leads exceeds the profits from those sales alone. Instead, UFSC's profits are generated by the sale of annuities and other insurance products, which often are used to fund the trusts. (Report at 40, ¶ 99.)

B.      Other relevant facts

Notwithstanding UFSC's protestations that the panel attorneys exercised independent professional judgment in counseling clients regarding their estate planning needs, several factors call into question the attorneys' ability and motivation to do so within the business model employed by UFSC. While no one factor necessarily is dispositive, they collectively present a troubling picture.[4]

---

[4] Evidence was received by the Commissioner to the effect that UFSC made slight adjustments to its business model in Indiana in 2009. For the reasons set forth by the Commissioner, we do not believe that these slight adjustments are sufficient to correct the deficiencies addressed in this opinion. (*See* Report at 49-51, ¶ 132.)

The disparity of fees earned, between the Estate Planning Assistants and Health Planning Assistants on the one hand (between $750 and $900 per sale of the most expensive estate plan package) and the panel attorneys on the other hand ($225 for drafting the documents and consulting with the client by phone), is indicative of an emphasis on sales and revenue rather than the provision of objective, disinterested legal advice. So too is the fact that an estate plan is sold to the client prior to any attorney involvement whatsoever. Similarly, that UFSC's profitability stems from the sale of insurance products related to the trusts created by the estate plans and the financial information and "leads" obtained by the Estate Planning Assistants and Health Planning Assistants tends to emphasize sales and revenue over objective, disinterested legal advice.

The testimony of various panel attorneys reveals minimal independent consultation with clients and heavy reliance on the communications between the client and the company's salesperson. One panel attorney testified the bulk of his legal practice was dependent on UFSC client referrals, and another panel attorney estimated that at least 85% of clients referred to him ordered the most expensive trust package as opposed to a simple will package. (Report at 42, 43, ¶¶ 102, 108; ISBA Exh. 10; Tr. at 692.) Several panel attorneys utilized standardized estate planning documents and forms that had been prepared and provided by UFSC,[5] and the letters sent by the panel attorneys to the Financial Planning Assistants regarding the execution of the estate planning instruments also were prepared by UFSC. (Report at 43-45, ¶¶ 112-13; Tr. at 681-83.) Explanation to the client of the relevance and purposes of the documents being executed typically was delegated to the Financial Planning Assistants. (Report at 45, ¶ 116.)

The experiences of particular UFSC clients, as reflected in the evidentiary record, also tend to illustrate that the estate planning services provided by UFSC often are superfluous and sometimes financially unsound. Ruth Springer serves as one such example. A seventy-two year old unmarried retiree in 2002, Springer was sold a revocable living trust through UFSC in 2002 for approximately $2,500. (Report at 52, ¶ 139.) At that time, she owned Exxon Mobil stock worth approximately $500,000 that reflected the bulk of her net worth. (Report at 51, ¶ 135.)

---

[5] These standardized documents often contained clauses inapplicable to the client, such as provisions for distribution to children for a client who never had children and community property provisions inapplicable in Indiana. (Report at 6, ¶ 14.)

When she purchased the UFSC estate plan, Springer already had a valid will (for which she had paid $20 in 1987). Both the original will and the UFSC estate plan contained the same dispositive provisions for distribution of the stock among Springer's six nieces and nephews and, thus, the UFSC estate plan was of little or no value to Springer. (Report at 53-54, ¶¶ 143-44; Tr. at 108-09.) According to Springer, UFSC did not ask her if she already had a will, and none of her estate planning needs were discussed during her brief phone conversation with the panel attorney. (Report at 54, ¶ 145; ISBA Exh. 103, ¶ 5.) After helping Springer execute the new estate planning documents, a Financial Planning Assistant convinced Springer to purchase three deferred annuities to fund the trust, and Springer sold the entirety of her Exxon Mobil stock to do so. (Report at 55, ¶ 149; UFSC Exh. 65, 66; ISBA Exh. 103, ¶¶ 7-8.) The Financial Planning Assistant testified this was done to create cash flow for Springer. (ISBA Exh. 107, pp. 126-27.) However, Springer already was receiving regular income from pension and social security payments, farming income, and stock dividends. (ISBA Exh. 101, pp. 19-27.)

The Financial Planning Assistant received a commission of $40,000 from UFSC for the sale of these annuities, and Springer incurred a tax liability of $132,000 as a result of the sale of her stock, which was a substantially greater liability than the Financial Planning Assistant had led Springer to expect. (Report at 7, 55-56, ¶¶ 16, 149, 152.) With the assistance of the Financial Planning Assistant, Springer then executed an amendment to the trust which provided that each of her six nieces and nephews would receive $5,000 instead of the Exxon Mobil stock. (Report at 56-57, ¶ 153; ISBA Exh. 103, ¶ 10.)[6]

Admittedly, Springer and the other clients named in the ISBA's verified petition reflect only a small fraction of those who have purchased estate plans from UFSC. As will be addressed

---

[6] Contemporaneous with the instant proceedings, Springer brought a separate civil action against several of the respondents. Presumably because the financial consequences of Springer's stock sale and purchase of annuities was not relevant to the issue of whether UFSC committed the unauthorized practice of law, neither the record in this case nor the Commissioner's findings squarely address or resolve the measure of these financial consequences. The record reflects the underwriter of the largest annuity Springer purchased, worth approximately $238,000, went into receivership, although UFSC contends that Springer was able to recover most of this money and purchase replacement annuities. (Report at 56, ¶ 151; ISBA Exh. 101, pp. 129-31, 137-63; Tr. at 77.) Springer's annuities had a minimum guaranteed interest rate of 3%. (ISBA Exh. 101, p. 122.) Meanwhile, Springer contends that the value of the Exxon Mobil stock more than doubled in the six years following Springer's sale of the stock. (Id. at 164, 169.)

7

in more detail below, it is conceivable that some clients may have received adequate estate planning services from UFSC and may be satisfied customers, notwithstanding the Commissioner's observation that "[n]ot a single satisfied [UFSC] customer appeared at trial to testify on behalf of [UFSC]." (Report at 7, ¶ 16.) Nevertheless, the experiences of Springer and the other UFSC clients identified in the ISBA's verified petition illustrate well the lack of meaningful attorney involvement in UFSC's business model and the consequences that may result.

### III. Unauthorized Practice of Law

This Court's authority to set standards for and supervise the practice of law arises from the need to protect the public from those who are not properly licensed or qualified to act as attorneys. State *ex rel.* Disciplinary Comm'n v. Owen, 486 N.E.2d 1012, 1014 (Ind. 1986). Although it is the province of this Court to determine what acts constitute the practice of law, we have not attempted to provide a comprehensive definition because of the infinite variety of fact situations. *See* Miller v. Vance, 463 N.E.2d 250, 251 (Ind. 1984). Nor do we attempt to do so today.

Nevertheless, we have held that preparing and drafting a will, and giving advice regarding the contents and effect of a will, constitute the practice of law. *See* State *ex rel.* Pearson v. Gould, 437 N.E.2d 41, 42 (Ind. 1982). Likewise, "[d]rafting and preparing testamentary and trust documents is clearly the practice of law." State *ex rel.* Indiana State Bar Ass'n v. Northouse, 848 N.E.2d 668, 673 (Ind. 2006). Indeed, UFSC does not question these principles; its contention instead is that its business practices are lawful due to the involvement of its panel attorneys.

Northouse provides meaningful guidance on this issue. Northouse, who was a registered securities representative and insurance agent but not an attorney, sold to clients "financial organization" books that included trust documents prepared by Ramer (also not an attorney) and Ramer's company STC. We held that Northouse and Ramer "crossed the line of permissible non-lawyer services and engaged in the unauthorized practice of law," notwithstanding the fact

8

that attorney-drafted forms were used as the starting point for preparation of the documents ultimately included in the "financial organization" books.  Id. at 672, 673.

Attempting to distinguish itself from the respondents in Northouse, UFSC argues that its business model is structured in a manner that sufficiently involves the exercise of independent professional judgment by attorneys, and notes that its panel attorneys play a greater role than merely drafting testamentary documents.  We are convinced, however, that UFSC's business model has marginalized the attorney's role to such a degree as to cross the line of permissible practices.  We are also convinced that the changes UFSC indicates it has made to its business model in Indiana since the filing of the verified petition are cosmetic at best and are not remotely sufficient to prevent its business model from running afoul of the prohibition against the unauthorized practice of law.

Accordingly, we hold that respondents in this case have engaged in the unauthorized practice of law and should be enjoined from continuing to do so.  We explore additional forms of relief below.

## IV.  Remedies

Among the remedies sought by the ISBA are requests that respondents be held liable for the ISBA's attorney fees and that respondents be required to disgorge fees collected from clients for unauthorized practices.  Oral argument was invited with respect to these issues, and we commend counsel for their thoughtful presentations.

A.    Attorney fees

Rule 24 provides, in part, that if a Commissioner is appointed to hear evidence and make findings, the "costs and expenses incurred by such hearing shall be borne by the losing party." The ISBA argues that "costs and expenses" under Rule 24 should include an award of attorney fees.

We are not persuaded that Rule 24, in its present form, provides a basis for an award of attorney fees. The Rule references only "costs and expenses," and the ISBA concedes that courts "generally construe 'costs' as a term of art that 'only includes filing fees and statutory witness fees.'" (Relator's Br. at 17 (citing Nance v. Miami Sand & Gravel, LLC, 825 N.E.2d 826, 839 (Ind. Ct. App. 2005)).) Citing the difficulty in prosecuting an original action alleging the unauthorized practice of law against a "well funded enterprise[ ] such as UFSC[,]" the ISBA urges that attorney fees should be read into the term "expenses." (Id. at 18-19.)

However, the ISBA did not request an award of attorney fees until its post-hearing brief, and the crux of the ISBA's argument in this respect is geared toward its allegation that UFSC's conduct in this litigation rested, at least in part, on baseless assertions and defenses. Accordingly, we believe the ISBA's entitlement to an award of attorney fees more appropriately is resolved by reference to Indiana Code section 34-52-1-1, which permits an award of attorney fees in "any civil action" where a party brings a defense, or continues to litigate a defense, when that defense is "frivolous, unreasonable, or groundless."

The Report of the Commissioner addresses the following claims made by UFSC during the course of this litigation in the context of its broader argument that the ISBA has an improper self-interest in bringing unauthorized practice actions under Rule 24. (*See* UFSC's Memorandum of Law in Support of its Motion to Dismiss at 2.) Specifically, UFSC asserted that the ISBA previously has resolved unauthorized practice cases via "settlements [that] often take the form of a contribution to the ISBA" and that these contributions "can amount to hundreds of thousands of dollars." (Id. at 11, 15.) The Commissioner expressly found these claims were "not accurate and there was no factual basis for this argument." (Report at 25, ¶ 41.) UFSC was advised of these inaccuracies and, at its request, was provided with a written statement from the ISBA's Executive Director verifying that such practices had never been done.

Despite conceding it had no evidence the ISBA had received monetary benefit for settling any previous unauthorized practice case, UFSC continued to claim that the ISBA "planned on receiving a substantial monetary 'contribution' from the UFSC Respondents" in addition to the ISBA's request for costs and attorney fees. (UFSC's Reply Brief in Support of its Motion to

10

Dismiss at 8.)  In a subsequent pleading, UFSC accused the ISBA of attempting to commit a fraud on the court.  (UFSC's Response to the ISBA's Objection / Motion to Strike at 5.)  The Commissioner likewise found this claim to be baseless, false and without merit.  (Report at 26, ¶ 46.)

With respect to UFSC's claims regarding the ISBA's past settlement practices, we agree with the Commissioner's finding that such claims were baseless, and we hold that the ISBA is entitled, under section 34-52-1-1, to an award of attorney fees incurred as a direct result of these claims.

Less obvious is whether statutory attorney fees are warranted with respect to UFSC's claims regarding ISBA's settlement offer in the instant case.  We agree with the Commissioner that these claims are without merit and that UFSC has "wrongly interpret[ed]" a letter of proposed settlement sent by ISBA's counsel, upon which UFSC based its assertion that the ISBA improperly was seeking a contribution as a condition of settlement.  (Report at 26, ¶ 45.)  Having reviewed the letter at issue, we conclude that the ISBA's reference to a "contribution," although undoubtedly a poor choice of words, was made "as a concept" within the context of addressing the remedies of disgorgement and attorney fees that the ISBA might request.  (UFSC's Response to the ISBA's Objection / Motion to Strike, Exh. 1 at 2-3.)  We do not read this letter as being indicative of any improper self-interest by the ISBA in bringing unauthorized practice actions under Rule 24.  Nevertheless, under these circumstances, we exercise our discretion to decline to award attorney fees to the ISBA incurred as a result of these particular claims.

The Commissioner found that the ISBA had expended approximately $19,500 in attorney fees as a direct result of UFSC's claims regarding the ISBA's past and current settlement practices.  Because we believe that statutory attorney fees are warranted only with respect to those attorney fees incurred as a result of UFSC's claims regarding the ISBA's past settlement practices, we remand to the Commissioner for a determination of this amount.

11

B.    Costs and expenses other than attorney fees

The Commissioner found that the ISBA paid $11,093.07 to its counsel for copying, phone calls, and other expenses routinely billed. The Commissioner additionally found that the ISBA paid $25,881.80 directly to various vendors for copies and transcripts and to attorney Sarah McShea, who gave testimony in rebuttal to Professor William Hodes, an attorney who testified on behalf of UFSC regarding his opinion that UFSC's business model was legitimate.

UFSC argues that the expenses paid to attorney McShea should not be recoverable by the ISBA under Rule 24, on the premise that expert testimony is inappropriate during unauthorized practice proceedings. While UFSC's objection to McShea's testimony as improper expert testimony originally was sustained by the Commissioner, McShea ultimately was permitted to testify only in rebuttal after UFSC presented Hodes's testimony. The Commissioner found both Hodes's and McShea's testimony instructive and helpful in making his findings. (Report at 20, ¶ 27).

We conclude that the sums cited by the Commissioner, including the amount paid to McShea, are properly included as "costs and expenses" under Rule 24 under the circumstances present here. The costs and expenses associated with the Commissioner's services in this matter also shall be borne by the respondents.

C.    Disgorgement

The remedy addressed in most of our prior decisions in unauthorized practice cases has been injunctive relief. *See*, e.g., State *ex rel*. Indiana State Bar Ass'n v. Diaz, 838 N.E.2d 433 (Ind. 2005); State *ex rel*. Disciplinary Comm'n v. Crofts, 500 N.E.2d 753 (Ind. 1986); Owen, 486 N.E.2d 1012; State *ex rel*. Indiana State Bar Ass'n v. Indiana Real Estate Ass'n, 244 Ind. 214, 191 N.E.2d 711 (1963).

Disgorgement was first addressed as a potential remedy in unauthorized practice actions in Northouse. Observing that the purpose of Rule 24 "is not to find fault or assess liability but to

protect the public from those not properly licensed or otherwise qualified to act as attorneys," we held that in addition to an injunction, the respondents should be prohibited from retaining fees for unauthorized practices so as "to deter similar conduct in the future and, ultimately, to protect the public." Northouse, 848 N.E.2d at 674. We noted that the prohibition against the unauthorized practice of law would be much less effective if an offending party were permitted to retain fees collected for unauthorized services. Id.

The issue of disgorgement is more complex here than it was in Northouse. In that case, the respondents were charged with unauthorized practices in only eight instances over an approximately two-year span, and the briefs filed by the respondents did not deny that they had engaged in the unauthorized practice of law. In contrast, UFSC contends it structured its business model in good faith and performed due diligence in attempting to ensure its practices were permissible. Moreover, UFSC has been marketing and selling estate plans since 1995, and sold 1,306 estate plans in Indiana from October 2006 through May 2009 alone.

UFSC sought and obtained advice regarding the legality of its business model from at least three different sources. One of these sources, Professor Hodes, offered his opinion to UFSC in 2006 that its business model did not involve the unauthorized practice of law. Nevertheless, at least two events should have alerted UFSC that it was committing unauthorized practices. In 2006, Northouse announced that the sale of estate plans and preparation of related legal instruments by non-attorneys constituted the unauthorized practice of law, even where the forms used to create the legal instruments originally had been created by an attorney. And well before Northouse, attorney Bruce Kotzan, from whom UFSC solicited legal advice regarding its business model, warned UFSC in 1999 that it

> is my opinion that you can employ attorneys to represent individuals in the course of your marketing of estate planning products, but the lawyer's representation of the clients must truly be independent. The attorney must represent the client and not the company. There must be contact between the client and the attorney. In the event employees of the company engage in the gathering of information for the preparation of documents, these employees must be acting under the direction of the attorney.

(Report at 8, ¶ 17; ISBA Exh. 14 at 3). Kotzan's advice was correct but was not followed by UFSC.

13

We pause for a moment to consider the value and necessity of a disgorgement remedy. Many of UFSC's clients may have civil causes of action against one or more respondents available to them, and in fact the record discloses that some UFSC clients have received at least some remedy through separate civil actions. For those persons such as Ruth Springer, whose involvement with UFSC seemingly has resulted in identifiable harm to her estate planning needs and financial portfolio, a civil action may prove a more adequate and complete remedy. For other clients of UFSC, however, including those who conceivably may prove to be satisfied customers, mere notice and opportunity to request a refund likely will be adequate.

Notwithstanding the potential availability of other civil remedies, we believe disgorgement or a similar form of restitutionary remedy serves as a more reliable and effective deterrent against the unauthorized practice of law and better protects the public from such practices. Persons or companies should be deterred from the unauthorized practice of law irrespective of the actual harm their conduct may cause, and the fact that some of the persons who have purchased estate plans from UFSC may have received a product adequate for their needs does not alter the illegality of UFSC's conduct.

We are left to determine the appropriate scope and manner of a restitutionary remedy in this case. Alluding to due process and *ex post facto* concerns, and noting that <u>Northouse</u> was the first unauthorized practice action in which we ordered disgorgement, UFSC argues that any restitutionary order issued in this case should extend back no further than the date of the <u>Northouse</u> decision because UFSC was not "on notice that disgorgement was a potential punishment" prior to <u>Northouse</u>. We are not persuaded by this line of reasoning for at least two reasons. First, disgorgement is not a "punishment" but rather an equitable form of relief. <u>Nichols v. Minnick</u>, 885 N.E.2d 1, 4-5 (Ind. 2008); <u>Wenzel v. Hopper & Galliher, P.C.</u>, 830 N.E.2d 996, 1001 (Ind. Ct. App. 2005). Second, as we observed in <u>Northouse</u>, appellate courts previously have held in an analogous setting that a non-lawyer plaintiff is not entitled to recover a fee for rendering legal services. <u>Id.</u> at 674 n.3 (citing <u>Fink v. Peden</u>, 214 Ind. 584, 17 N.E.2d 95 (1938), and <u>Harris v. Clark</u>, 81 Ind.App. 494, 142 N.E. 881 (1924)).

Nevertheless, as discussed above, we do think <u>Northouse</u> is relevant to the issue of disgorgement to the extent it should have put UFSC on clear notice that its practices were unlawful. Regardless of whether UFSC acted properly prior to <u>Northouse</u> to ascertain whether its practices were lawful, the illegality of UFSC's business model certainly should have been apparent after <u>Northouse</u>. Accordingly, we conclude UFSC should not be entitled to retain fees collected for the sale of estate plans following the date of the <u>Northouse</u> decision.

In <u>Northouse</u>, we ordered the respondents to provide notice of our opinion to the clients who had purchased the "financial organization" books at issue, in order to enable those clients to make informed decisions regarding their estate planning needs and any potential civil actions that they might pursue separately against the respondents. Under the circumstances of this case, we believe it is appropriate to fashion a restitutionary remedy in connection with such a notice requirement. In addition to providing individual written notice of this opinion to all readily identifiable persons to whom it has sold estate plans, UFSC also shall provide individual written notice to all such persons to whom estate plans were sold following the date of the <u>Northouse</u> decision in 2006 that they are entitled to a refund, upon request, of sums paid for the purchase of an estate plan.

We note that the parties agreed, and the Commissioner ordered, that UFSC preserve records identifying clients who had purchased estate plans from the inception of such sales in 1995. (Report at 82, ¶ 253.) Recognizing the complexity of UFSC's corporate structure, the involvement of multiple respondents in the sale of the estate plans, and the substantial number of clients affected, we remand to the Commissioner with instructions to resolve the particular details such notice shall take and to issue a restitutionary order not inconsistent with this opinion.

## V. Conclusion

The evidence establishes that the respondents have engaged in the unauthorized practice of law. Respondents, including any parent or subsidiary company of UFSC, hereby are ORDERED not to engage in acts that would constitute the unauthorized practice of law. Such acts include, but are not limited to, the practices described in this opinion as well as the revised

15

practices in which UFSC now claims to engage, as described in paragraph 24 of the Commissioner's report. This injunction does not prevent the respondents from performing non-legal services for their clients.

In addition, Respondents are ORDERED to provide a copy of this opinion to all reasonably identifiable persons to whom they have sold estate plans since 1995. This notice is intended to allow each purchaser the opportunity to make an informed decision regarding their estate planning needs and take any other action that may be appropriate, including consultation with a duly licensed attorney of his or her choosing. Respondents also are ORDERED, in a manner that shall be determined by the Commissioner on remand, to notify all reasonably identifiable persons to whom estate plans were sold following the date of the Northouse decision in 2006 that they are entitled to a refund, upon request, of sums paid for the purchase of an estate plan.

It is further ORDERED that Respondents are jointly and severally responsible for the refund of fees paid by those to whom estate plans were sold, as may be requested by those to whom estate plans were sold. On remand, the Commissioner shall issue a restitutionary order consistent with this opinion which, if appropriate, also may be made applicable to all parent and subsidiary companies of UFSC and their principals individually.

It is additionally ORDERED that Respondents are jointly and severally responsible for the reasonable attorney fees, in an amount that shall be determined by the Commissioner on remand, incurred by the ISBA as a direct result of the respondents' baseless arguments with respect to the ISBA's past settlement practices.

It is finally ORDERED that Respondents are jointly and severally responsible for the payment of costs and expenses to the ISBA in the amount of $36,974.87, and for the payment of costs and expenses associated with the Commissioner's services in this matter, which shall be fixed by separate order of this Court following the Commissioner's submission of his statements of costs and expenses to this Court.

This matter is remanded to the Commissioner for further proceedings consistent with this opinion.


Dickson, Sullivan, Boehm, and Rucker, JJ., concur.
Shepard, C.J., concurs in all respects save the decision on attorney fees, Part IV-A, believing that Relator's request for fees incurred in prosecution should be granted.