

**FILED**

May 23 2016, 9:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kevin P. Podlaski
Micah J. Nichols
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

David Lee Steiner
Aaron T. Craft
Deputy Attorneys General
Indianapolis, Indiana

## I N  T H E
# COURT OF APPEALS OF INDIANA

Consumer Attorney Services, P.A., The McCann Law Group, LLP, and Brenda L. McCann, individually and as owner and/or officer of Consumer Attorney Services, P.A. and the McCann Law Group, LLP,

*Appellants-Defendants,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 23, 2016

Court of Appeals Cause No. 49A05-1504-PL-274

Appeal from the Marion Superior Court

The Honorable John F. Hanley, Judge

Trial Court Cause No. 49D11-1401-PL-1477

**Barnes, Judge.**

# Case Summary

Consumer Attorney Services, P.A. ("CAS"), The McCann Law Group, LLP ("MLG"), and Brenda McCann ("McCann") (collectively "the Defendants") appeal the trial court's denial of summary judgment against the Attorney General of Indiana ("Attorney General"). We affirm in part and reverse in part.

# Issues

The issues before us are:

> I.      whether MLG, CAS, and McCann are exempt from liability under the Credit Services Organization Act under that Act's exemption for attorneys;

> II.      whether MLG, CAS, and McCann are exempt from liability under the Mortgage Rescue Protection Fraud Act under that Act's exemption for attorneys;

> III.      whether MLG, CAS, and McCann are exempt from liability under the Home Loan Practices Act; and

> IV.      whether MLG, CAS, and McCann are exempt from liability under the Deceptive Consumer Sales Act.

# Facts

The evidence most favorable to the Attorney General as the summary judgment nonmovant is that McCann, a Florida attorney, incorporated CAS in Florida in

April 2011.[1]  Later, CAS was converted into MLG in Florida.  On March 1, 2013, MLG registered with the Indiana Secretary of State as a foreign LLP. From April 8 to September 9, 2013, MLG operated in Indiana under the CAS name.  MLG/CAS[2] held itself out as a multi-jurisdiction consumer advocacy law firm designed to assist homeowners who were facing foreclosure.  It advertised its services to Indiana residents regarding foreclosure defense or home loan modification on the internet, television, and radio.  Customers who agreed to obtain MLG/CAS's services were required to provide bank account information from which monthly payments to MLG/CAS were withdrawn automatically.  MLG/CAS increased the monthly payment amount if a customer's mortgage company initiated foreclosure proceedings.

[4]  McCann was never licensed to practice law in Indiana.  MLG/CAS entered into arrangements with five different licensed Indiana attorneys to carry out its business here.  All of these attorneys practiced law in Indiana separate and apart from their affiliation with MLG/CAS.  With attorney Justin Wall, MLG/CAS originally entered into an "Associate Agreement," and he later executed a "Partners Addendum."  App. pp. 75, 441.  The partnership agreement granted Wall a one percent non-voting interest in MLG/CAS. Under the agreement, Wall was to:  provide legal representation, advice, and

---

[1] McCann later was effectively disbarred by the Florida Supreme Court.  *See In re Petition for Disciplinary Revocation of McCann*, 153 So.3d 905 (Fla. 2014).

[2] We will refer to MLG and CAS collectively as MLG/CAS, given that it was one single entity that used both names at various times.

supervision to clients on Indiana cases as assigned to him by MLG/CAS; participate in client intake and make referrals to other attorneys as needed; maintain knowledge of and advise MLG/CAS of Indiana professional responsibility rules; review and audit monthly firm reports; and participate in firm meetings and comply with firm rules. Wall's employment with MLG/CAS was described as an "at-will relationship." *Id.* at 442.

[5] Attorneys Eric Jackson and Kimberly Vereb entered into "Of Counsel" agreements with MLG/CAS. *Id.* at 81, 94. These agreements specified that Jackson and Vereb were independent contractors and not employees of MLG/CAS. Jackson's agreement specified that he was retained for the purpose of assisting firm clients in the filing of bankruptcy petitions, using documentation provided solely by the firm.[3] Vereb's agreement was not so limited. It did expressly acknowledge that Vereb was not intended to be employed full-time, and that she was solely responsible for all overhead expenses associated with her practice.

[6] Attorneys Jonathan Albright and Jeffrey Branstetter entered into "Associate" agreements with MLG/CAS. *Id.* at 83, 86. These agreements specified that Albright and Branstetter were considered independent contractors and detailed the type and scope of legal work they were expected to perform.

---

[3] Most of Jackson's agreement is not in the record before us.

[7] The Attorney General began investigating MLG/CAS after receiving numerous consumer complaints. The investigation focused on five particular Indiana customers of MLG/CAS: James Vaughn, Terrance Hollowell, Tonya Green, James Daughtery, and Petronie Paul. These five individuals executed foreclosure defense agreements with MLG/CAS between January 9, 2012, and August 29, 2012. The individuals have asserted that they had little to no communication with any Indiana attorneys regarding their cases and, in some instances, were never informed who their assigned Indiana attorney was. Additionally, the individuals and the Attorney General have asserted that MLG/CAS and the Indiana attorneys performed little to no actual legal services on the individuals' behalf, yet the individuals were required to pay fees upfront to MLG/CAS that were never returned. The individuals and Attorney General also claim that the individuals received little communication from MLG/CAS, that the bulk of such communications was through persons other than the Indiana attorneys, and that MLG/CAS representatives were evasive in communicating when contacted by the individuals.

[8] Following the investigation, the Attorney General sued the Defendants for purported violations of the Indiana Credit Services Organization Act ("CSOA"), Indiana Code Chapter 24-5-15, the Mortgage Rescue Protection Fraud Act ("MRPFA"), Indiana Code Article 24-5.5, the Home Loan Practices Act ("HLPA"), Indiana Code Article 24-9, and the Deceptive Consumer Sales Act ("DCSA"), Indiana Code Chapter 24-5-0.5. Specifically, the Attorney General alleged the Defendants violated the CSOA by receiving payment for

services before they were completed and by failing to post and file a surety bond of $25,000 before conducting business in Indiana. The Attorney General alleged the Defendants violated the MRPFA by receiving compensation before full performance of contracted services and by failing to provide certain written notices required by both the MRPFA and the CSOA. As for the HLPA, the Attorney General alleged that the Defendants engaged in "deceptive acts" prohibited by the HLPA specifically by violating the CSOA and the MRPFA. *Id.* at 24. Finally, with respect to the DCSA, the Attorney General alleged that the Defendants committed prohibited "deceptive acts" by violating the CSOA and also by "representing to consumers that the Defendants had the characteristics of experienced consultants with in-depth industry knowledge on how to avoid and stop foreclosure . . . ." *Id.* at 25. The Attorney General further claimed under the DCSA that the Defendants knowingly and intentionally engaged in incurable deceptive acts, thus subjecting the Defendants to fines of $500 per violation. The Attorney General's lawsuit did not name any of the individual Indiana licensed attorneys as defendants.

[9] The Defendants moved for summary judgment. They claimed they were explicitly exempt from the scope of the CSOA and the MRPFA because those Acts expressly do not apply to attorneys, and that attorneys are impliedly exempt from the HLPA and DCSA, particularly given the nature of the Attorney General's allegations. The trial court denied the Defendants' summary judgment motion but certified its order for interlocutory appeal, which we have agreed to entertain pursuant to Indiana Appellate Rule 14(B).

## Analysis

When we review a grant or denial of a motion for summary judgment, we apply the same standard as the trial court. *Knighten v. E. Chicago Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015). "The moving party must show there are no genuine issues of material fact and it is entitled to judgment as a matter of law." *Id.* If this burden is met, the non-moving party must present evidence establishing the existence of a genuine issue of material fact. *Id.* We must consider only the evidence specifically designated by the parties in determining whether summary judgment should have been granted or denied. *Id.* (citing Ind. Trial Rule 56(C), (H)). "We construe all factual inferences in favor of the non-moving party and resolve all doubts regarding the existence of a material issue against the moving party." *Id.* We may affirm the denial of summary judgment on any legal theory or basis supported by the designated evidence.[4] *Illinois Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 253 (Ind. Ct. App. 2009), *trans. denied*.

---

[4] The Defendants argue in their reply in brief that the Attorney General has improperly raised arguments for affirming the denial of summary judgment that do not "focus on the actual issue that was certified on appeal, which is whether a Law Firm Exception exists or should exist under Indiana's Consumer Protection Laws." Reply Br. p. 3. Neither the trial court's order certifying its denial of summary judgment for interlocutory appeal nor this court's order accepting jurisdiction narrowly limited the issue to be decided on appeal. Rather, consistent with the proper standard of review, we may affirm the denial of the Defendants' motion for summary judgment on any theory supported by the designated evidence.

# I. CSOA

The CSOA prohibits certain actions by "credit service organizations," which are defined as persons (or companies) that promise to do things such as improve credit scores, obtain credit for another person, or obtain a delay or forbearance of a mortgage obligation. Ind. Code § 24-5-15-2(a). Among other things, a credit service organization cannot charge or receive money before the complete performance of services that the organization agreed to perform for a consumer unless the organization has procured a surety bond of $25,000. I.C. §§ 24-5-15-5, 24-5-15-8. The CSOA also requires detailed information to be provided to a consumer before entering into a contract with a credit services organization, and requires that consumers be informed of their right to cancel a contract with the organization within three days. I.C. §§ 24-5-15-6, 24-5-15-7.

The CSOA also explicitly states: "The term 'credit services organization' does not include any of the following: . . . (6) A person admitted to the practice of law in Indiana if the person is acting within the course and scope of the person's practice as an attorney." I.C. § 24-5-15-2(b)(6). Also, "person" is defined under the CSOA to mean "an individual, a corporation, a partnership, a joint venture, or any other entity." I.C. § 24-5-15-4. The CSOA does not explicitly state whether it exempts law firms from the scope of its coverage. We must interpret the statute to determine whether the Legislature also intended to include law firms within this exemption. The Defendants argue that they ought to be included within that exemption.

[13] "The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question." *Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009). If a statute is clear and unambiguous, we apply no rules of construction other than to take words and phrases in their plain, ordinary, and usual sense. *Id.* However, if a statute is susceptible to more than one interpretation, it is deemed ambiguous and thus open to judicial construction and application of rules of interpretation. *Id.*

[14] If a statute is ambiguous, our goal in applying rules of statutory construction is to determine and give effect to the Legislature's intent. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). Among other things, we must read statutes as a whole, "avoiding excessive reliance on a strict, literal meaning or the selective reading of individual words." *Id.* Additionally, we will presume the Legislature intended statutory language to be applied logically and consistently with the statute's underlying policy and goals, and we avoid construing a statute so as to create an absurd result. *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1154 (Ind. 2013). We must assume that the Legislature used all language in a statute intentionally, and we will strive to give effect to every word. *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004). Statutes should be given practical application and construed so as to prevent absurdity, hardship, or injustice, and to favor public convenience. *Id.* Any exceptions to a statute's application generally should be strictly construed. *Natural Res. Comm'n of Indiana Dep't of Natural Res. v. Porter County Drainage Bd.*, 576 N.E.2d 587, 589 (Ind. 1991).

[15]  The Attorney General and the Defendants are in full agreement that the CSOA is ambiguous with respect to whether it exempts law firms from the definition of a credit service organization. And, the Attorney General concedes on appeal "that the law firm of an Indiana attorney exempt under the CSOA . . . is also exempt from the CSOA." Appellee's Br. p. 34. The parties agree with the logic of the Kansas Supreme Court's decision in *Hays v. Ruther*, 313 P.3d 782 (Kan. 2013), which interpreted a similarly-worded attorney exemption under Kansas's Credit Services Organization Act ("KCSOA"), which also did not include an express law firm exemption.

[16]  In *Hays*, two Kansas residents brought suit in federal court against an out-of-state limited liability company that they had hired to assist them with consumer debt and dealing with creditors. The suit alleged violations of the KCSOA and the Kansas Consumer Protection Act ("KCPA"). As with the Indiana CSOA, the KCSOA exempted "[a]ny person licensed to practice law in this state" from the definition of a credit services organization, and defined a "person" to include corporations, partnerships, and other business organizations. *Hays*, 313 P.3d at 786 (citing Kan. Stat. Ann. §§ 50-1116(b) and 50-1117(f)). The *Hays* court concluded that the KCSOA was ambiguous, noting there was a conflict between the attorney exemption and the definition of a "person" because business organizations cannot be licensed to practice law. *Id.* Engaging in statutory construction, the court held, "the legislature intended the attorney exception in KCSOA to apply to the law firm of an attorney who is exempt from the provisions under the Act." *Id.*

[17] The first reason the court gave for this conclusion was that "exempting attorneys without exempting law firms may produce absurd results." *Id.* The court explained:

> For example, attorneys often employ consultants and paralegals who may engage in timekeeping for billing purposes. To exempt attorneys from statutory requirements and penalties while subjecting their support staff to such requirements and penalties would at the very least vastly complicate the practice of law and in many instances could render it impractical. Furthermore, attorneys frequently set up their practices as business organizations. Attorneys who elect to form limited liability companies would find themselves in the peculiar situation of being exempt as individuals from the reach of KCSOA but subject to all the requirements of KCSOA in their business organizational capacity.

*Id.* (citation omitted). The court held it would be impracticable and unreasonable to interpret the KCSOA to not apply to a covered attorney's law firm. *Id.*

[18] The court gave a second reason for its holding: after the filing of the suit in the case, the Kansas Legislature amended the KCSOA to expressly include an attorney's law firm as being exempt from the Act's coverage. *Id.* at 787. Minutes from discussion of the amendment in the legislature indicated that this amendment was intended as a clarification, not expansion, of the original attorney exemption. *Id.*

[19] Our General Assembly has not enacted an express law firm exemption under the CSOA, unlike the Kansas Legislature. However, the Attorney General

nonetheless concedes that it would be absurd to exempt a licensed Indiana attorney from the CSOA's coverage, but not that attorney's law firm. We agree. It would be unreasonable to excuse an attorney from complying with the CSOA in his or her individual capacity while simultaneously requiring him or her to comply with it as an employee or member of a law firm. It also would expose non-lawyer employees of a law firm to indirect liability for violations of the CSOA for which the firm's attorneys would be immune.

[20] Additionally, we presume that in enacting the CSOA and creating the attorney exemption, the General Assembly was cognizant of the Indiana Supreme Court's traditional role in regulating the practice of law in this state through its Disciplinary Commission, the Admission and Discipline Rules, and the Rules of Professional Conduct. The constitutional basis of this role is found in Article 7, Section 4 of the Indiana Constitution, which vests the Indiana Supreme Court with "original jurisdiction . . . in admission to the practice of law, discipline or disbarment of those admitted; [and] the unauthorized practice of law." Additionally, Indiana Code Section 33-24-1-2(b) provides that our supreme court "has exclusive jurisdiction to: (1) admit attorneys to practice law in all courts of the state; and (2) issue restraining orders and injunctions in all cases involving the unauthorized practice of the law; under rules and regulations as the supreme court may prescribe." Although this statute makes specific reference only with respect to "restraining orders and injunctions in all cases involving the unauthorized practice of law," our supreme court seems to

take a broader view of its exclusive jurisdiction in this area, as reflected in Indiana Appellate Rule 4(B):

> The Supreme Court shall have exclusive jurisdiction over the following matters:
>
> (1) The Practice of Law.
>
> Matters relating to the practice of law including:
>
>> (a) Admissions to practice law;
>>
>> (b) The discipline and disbarment of attorneys admitted to the practice of law; and
>>
>> (c) The unauthorized practice of law (other than criminal prosecutions therefor).

Thus, our supreme court has exclusive jurisdiction to penalize lawyers for ethical violations beyond issuing injunctions against the unauthorized practice of law. We further note that, under Article 3, Section 1 of the Indiana Constitution, the separation of powers provision, no member of the legislative, executive, or judicial branches may exercise any of the functions of another branch of government, except as expressly provided by the Constitution.

[21] Appellate Rule 4(B) does contain an express exemption from our supreme court's exclusive jurisdiction regarding lawyer discipline, with its reference to "criminal prosecutions" for the unauthorized practice of law. Currently, such prosecutions are expressly permitted by Indiana Code Section 33-43-2-1. It has

been held that such prosecutions do not violate the separation of powers doctrine. *Levy v. State*, 799 N.E.2d 71, 75-76 (Ind. Ct. App. 2003) (addressing preceding version of statute, Ind. Code § 33-1-5-1), *trans. denied*; *see also State ex rel. Indiana State Bar Ass'n v. Northouse*, 848 N.E.2d 668, 675 (Ind. 2006) (citing *Levy* with approval). We conclude however, given the constitutional language and the language of Appellate Rule 4(B), that any intrusions upon our supreme court's authority regulating the practice of law in this state must be expressed by our General Assembly in clear and unmistakable language. Such language is lacking under the CSOA. Moreover, we deem that the intent of the General Assembly in exempting attorneys from coverage of the CSOA was to entrust our supreme court to adequately police lawyers and their firms in this area. There also is the potential for conflicting obligations between the CSOA and the Rules of Professional Conduct regarding matters such as attorney fees and obligations to clients; it makes sense that lawyers and their firms should concern themselves with having to comply with one set of rules, not multiple sets.

[22] Although the Attorney General agrees that licensed Indiana attorneys and their law firms are both exempt from the CSOA, it contends that MLG/CAS does not actually qualify as a "law firm," or at least that there are questions of fact as to whether it does so. The Attorney General notes that much of the complained-of activity in this case occurred out-of-state (such as communication or lack thereof), that the Indiana attorneys had very little actual involvement in providing legal representation to Indiana clients of MLG/CAS,

and that much of the document preparation was handled by non-Indiana attorneys or employees of MLG/CAS and not the Indiana attorneys.

[23] The Attorney General notes that in *Hays*, the Kansas Supreme Court stated that it was "not asked to define a law firm, and we take no position on whether the defendant Consumer Law Associates, LLC is an exempt law firm under the KCSOA." *Hays*, 313 P.3d at 787. The Attorney General then directs us to *Parks v. Persels & Associates, LLC*, 509 B.R. 345 (D. Kan. 2014). In that case, a heavily-indebted Kansas individual contacted a debt settlement company that advertised on the internet; that company in turn referred the individual to Persels and Associates, LLC ("Persels"), a Maryland-based law firm with no Kansas-based partners or employees. Persels, however, had an independent contractor relationship with a Kansas attorney, Stan Goodwin, who was supposed to provide debt settlement services for the individual. The vast majority of the actual work related to the case, however, was performed by Persels's staff and attorneys other than Goodwin. After the individual had made many months of payment on a debt settlement plan, his total debt had barely been paid down because most of the payments went toward legal fees for Persels and Goodwin. One of the individual's creditors brought suit against the individual, who then filed for bankruptcy. The bankruptcy trustee then filed an adversarial action against Persels and Goodwin to recover payments made to them, pursuant to the KCSOA and the KCPA, and also alleged legal malpractice and breach of fiduciary duty.

Persels and Goodwin moved for summary judgment; the bankruptcy court recommended denial of this motion, which the district court adopted. With respect to claims under the KCSOA versus Persels, the court declined to allow the firm to invoke the attorney exemption based upon its independent contractor relationship with Goodwin. The court noted that none of Persels's members or staff attorneys were admitted to practice law in Kansas, which was the reason it entered into an independent contract arrangement with Goodwin in order to represent the individual debtor. *Parks*, 509 B.R. at 352-53. The court concluded with respect to Persels:

> If anything, the court finds that the problem of the "absurd result" identified in *Hays* would arise only if the court were to adopt Persels' argument relating to the exemption. If the court so held, it would mean that Kansas attorneys and their law firms would be subject to regulation by the Kansas Supreme Court, while non-lawyer credit services organizations were subject to the KCSOA. But out-of-state attorneys, such as Persels, would remain wholly unregulated under Kansas law.

*Id.* at 353.

The court also concluded that even Goodwin was not necessarily entitled to the attorney exemption under the KCSOA. It noted the lack of work he performed on the case and lack of advice given and that fees were paid solely to Persels, who in turn paid Goodwin. The court held:

> The facts set forth by the bankruptcy court would support the conclusion that Goodwin is not entitled to the exemption. As noted earlier, the KCSOA exemption applies only to an attorney

"acting within the course and scope of such person's practice as an attorney." Here, the [sic] Goodwin's departure from the minimal expectations of any attorney is so complete that a rational fact finder could determine that he was not acting as an attorney at all. The bankruptcy court correctly observed, "If this is the extent of what Goodwin does for his 'clients,' whether he is 'practicing law' as that term is commonly understood is questionable."

*Id.*

[26] The Attorney General urges us to find this case parallel to *Parks* and to hold that there are genuine issues of material fact as to whether MLG/CAS actually was the "law firm" of the Indiana lawyers so as to warrant application of the CSOA attorney exemption. We decline to do so. First, the *Parks* court's decision not to exempt Persels from coverage of the KCSOA seems to have been based in large part on the perception that if the exemption was invoked, Persels could evade both compliance with the KCSOA and regulation by the Kansas Supreme Court because it was an out-of-state law firm.

[27] In Indiana, however, our supreme court has been very clear that it has the authority to regulate both entities not admitted to the Indiana bar, as well as out-of-state lawyers. *See In re Coale*, 775 N.E.2d 1079, 1081 (Ind. 2002) ("Notwithstanding the fact that the respondents hold no Indiana law licenses and therefore are not subject to this Court's usual disciplinary sanctions for licensed Indiana attorneys who engage in professional misconduct, any acts which the respondents take in Indiana that constitute the practice of law are subject to our exclusive jurisdiction to regulate professional legal activity in this

state."), *cert. denied*; *Northouse*, 848 N.E.2d at 671-72 (disciplining non-attorneys located in Indiana for the unauthorized practice of law). Thus, even if MLG/CAS is exempt from the scope of the CSOA, our supreme court possesses the authority to take disciplinary action against the firm. Such authority does not appear to be dependent upon whether or when MLG/CAS registered as a law firm with either the Indiana Secretary of State or the Board of Law Examiners; at least, our supreme court has never mentioned such a requirement. Additionally, our supreme court has imposed remedies for ethical violations against lawyers and non-lawyers that include return of unreasonable fees or fees collected for the unauthorized practice of law. *See In re Hailey*, 792 N.E.2d 851, 864 (Ind. 2003); *State ex rel. Indiana State Bar Ass'n v. United Fin. Sys. Corp.*, 926 N.E.2d 8, 18 (Ind. 2010), *cert. denied*.

[28] Second, to the extent the *Parks* court found it relevant to delve into Goodwin's lack of actual legal work as an indication that both he and Persels were not entitled to the KCSOA attorney exemption, we decline to apply such a holding. We acknowledge the evidence in the record that the bulk of the actual work performed for and communication with Indiana residents originated in MLG/CAS's Florida offices. Still, one of the Indiana attorneys with which MLG/CAS contracted was assigned to represent each Indiana resident; both the contracts between MLG/CAS and the attorneys, and those between MLG/CAS and the consumer residents, were related to the provision of legal services and thus within the scope of the CSOA attorney exemption. Whether those attorneys actually provided a minimally-acceptable level of legal services

to those residents is precisely the type of ethical question that ordinarily is entrusted exclusively to our supreme court, unless there is a question of legal malpractice or the unauthorized practice of law.

[29]     Indeed, one of those attorneys, Jackson, has been disciplined for precisely that reason regarding his association with MLG/CAS. Specifically, Jackson agreed that he violated the following ethical rules:

> 1.4(a)(1): Failure to promptly inform a client of circumstance (limited scope of employment) to which the client's informed consent is required.
>
> 1.4(a)(2): Failure to reasonably consult with a client about the means by which the client's objectives are to be accomplished.
>
> 1.4(a)(3): Failure to keep a client reasonably informed about the status of a matter.
>
> 1.4(a)(5): Failure to consult with client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance.
>
> 1.4(b): Failure to explain a matter to the extent reasonably necessary to permit a client to make informed decisions.
>
> 1.5(e): Failure to obtain a client's required approval of a fee division.
>
> 5.3(b) and Guideline 9.1: Failure to discharge responsibilities regarding supervision of non-lawyers.

> 5.4(c): Permitting a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.
>
> 5.5(a): Assisting in the unauthorized practice of law.
>
> 8.4(a): Knowingly assisting another to violate the Rules of Professional Conduct.
>
> 8.4(c): Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.
>
> 8.4(d): Engaging in conduct prejudicial to the administration of justice.

[30] *In re Jackson*, 24 N.E.3d 419, 420 (Ind. 2015). Jackson was suspended from practice for 120 days as a result of this unethical conduct. *Id.* at 420-21.

[31] Given that Jackson has been penalized by our supreme court for his MLG/CAS related work, and given that our supreme court has previously penalized out-of-state lawyers and/or unlicensed persons for practicing law in this state, it begs the question of why our supreme court should not be entrusted to take any necessary action against MLG/CAS. We acknowledge that the arrangements between the Indiana attorneys and MLG/CAS were perhaps not indicative of a traditional law firm-lawyer relationship, particularly because each of the Indiana attorneys maintained law practices completely separate from MLG/CAS. There is nothing in the record to indicate that the contracts between the Indiana attorneys and MLG/CAS were invalid or unenforceable.

They did in fact create employment relationships between the attorneys and the firm—four of whom were specified to be independent contractors, like the Kansas attorney in *Parks*, but one of whom was specified to be a partner with a one-percent ownership stake in MLG/CAS, unlike in *Parks*.

[32] Indiana Rule of Professional Conduct 1.0(c) defines a "law firm" as "a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law; or lawyers employed in a legal services organization or the legal department of a corporation or other organization." We note that the official commentary to this rule states:

> Whether two or more lawyers constitute a firm within paragraph (c) can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve.

Ind. Professional Conduct Rule 1.0(c), cmt. Here, there is no doubt the Indiana attorneys presented themselves to the public, and in particular to clients of MLG/CAS, as conducting business as part of a law firm. The relationship between the Indiana attorneys and MLG/CAS for the provision of legal services was cemented in the formal, detailed agreements they entered into. We conclude that the undisputed designated evidence clearly demonstrates as a

matter of law that MLG/CAS was the law firm of the Indiana attorneys for purposes of the CSOA attorney exemption. Thus, the trial court should have granted summary judgment in favor of MLG/CAS on the Attorney General's claims under the CSOA.

[33] We note, however, that McCann herself has never been a member of the Indiana bar, nor is she a "law firm." We do not believe that the express Indiana attorney exemption in the CSOA and the implied exemption for an attorney's law firm should be extended to individual attorneys within the firm who have never been licensed in Indiana. Although her firm and its employees may be exempt from CSOA liability, McCann in her personal capacity is not entitled to the protection of the CSOA attorney exemption, and summary judgment properly was denied as to McCann.

## II. MRPFA

[34] Next, we address whether MLG/CAS and McCann were entitled to summary judgment as to the Attorney General's claims under the MRPFA. The MRPFA imposes certain requirements upon "foreclosure consultants" who represent to homeowners that they can do things such as prevent, postpone, or reverse the effects of foreclosure. *See* I.C. § 24-5.5-2-2. Those requirements do not apply to any "attorney licensed to practice law in Indiana who is representing a mortgagor." I.C. § 24-5.5-1-1(6). The Attorney General points out that this attorney exemption is worded differently than the one under the CSOA, in that it expressly refers to "attorneys," and not "persons," and the MRPFA does not contain a further definition of "person" that includes business organizations.

The Attorney General thus contends that unlike the CSOA, the MRPFA exempts only individual attorneys from its coverage and not law firms.

[35] However, we find it would be equally absurd under the MRPFA to exclude an attorney from its requirements while subjecting his or her law firm to them. The vast majority of lawyers work within some form of law firm organization, ranging from sole proprietorships to multi-jurisdictional firms with hundreds of lawyers. As with the CSOA, it would make little sense to exempt attorneys from the MRPFA while simultaneously requiring them to comply with it, or else subject their law firm to sanctions—thus penalizing attorneys and their staff for failing to comply with a statute they are supposedly exempt from complying with. And as with the CSOA, the evidence demonstrates that MLG/CAS was the law firm of the Indiana attorneys, and thus exempt from coverage of the MRPFA. McCann herself, though, is still subject to liability under that act, for similar reasons as explained under the CSOA. MLG/CAS is entitled to summary judgment on the Attorney General's claims under the MRPFA, while McCann is not.

### III. HLPA

[36] The HLPA prohibits certain lending practices in connection with home loans, including the commission of "a deceptive act in connection with a mortgage transaction or a real estate transaction." I.C. § 24-9-3-7(c)(3). A "deceptive act" is one in which a person knowingly or intentionally makes a material misrepresentation, knowingly or intentionally conceals material information, or violates the MRPFA. I.C. § 24-9-2-7. In its complaint for violations of the

HLPA, the Attorney General alleged that the "deceptive acts" committed by MLG/CAS and McCann were the previously-stated violations of both the CSOA and the MRPFA. There was no other basis for any alleged violation of the HLPA. Because we have held that MLG/CAS is exempt from the coverage of both the CSOA and the MRPFA, any purported violations of those acts also cannot form the basis of any claim under the HLPA. However, again, McCann in her individual capacity may be held liable for violations of the HLPA. MLG/CAS is entitled to summary judgment on the HLPA claims, while McCann is not.

## IV. DCSA

[37] Finally, we address the Attorney General's claims against MLG/CAS and McCann under the DCSA. The DCSA generally prohibits a "supplier" from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." I.C. § 24-5-0.5-3(a). A "supplier" is defined as:

> (A) A seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including soliciting a consumer transaction by using a telephone facsimile machine to transmit an unsolicited advertisement. The term includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer.

> (B) A person who contrives, prepares, sets up, operates, publicizes by means of advertisements, or promotes a pyramid promotional scheme.

(C) A debt collector.

I.C. § 24-5-0.5-2(a)(3).  Attorneys are expressly exempt from the definition of "debt collector" but are otherwise not mentioned in the DCSA.  I.C. § 24-5-0.5-2(a)(15).  A "consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . ."  I.C. § 24-5-0.5-2(a)(1).  The Attorney General notes that MLG/CAS fits within the definition of a "supplier" under the DCSA because it regularly solicited and engaged in business related to the sale of services.  In its reply brief, MLG/CAS does not refute this assertion or make any separation of powers argument regarding regulation of the legal profession by our supreme court or in any way explain why it would not be covered by the DCSA.

[38]  In his complaint, the Attorney General alleged that MLG/CAS and McCann violated the DCSA by (1) violating the CSOA, and (2) "representing to consumers that Defendants had the characteristics of experienced consultants with in-depth industry knowledge on how to avoid and stop foreclosure . . . ."  App. p. 25.[5]  As with the HLPA claims, because MLG/CAS is exempt from the requirements of the CSOA, it likewise cannot be held liable for any violations of

---

[5] The Attorney General also alleged that the Defendants committed deceptive acts "with knowledge and intent to deceive . . . ."  App. p. 25.  On appeal, the Attorney General characterizes this as a separate allegation of deceptive conduct by the Defendants under the DCSA; however, this does not appear to be a separate allegation, as opposed to a necessary mens rea element that would justify the imposition of civil penalties against the Defendants for the other stated violations of the DCSA.  *See* I.C. § 24-5-0.5-4(g).

the CSOA under the DCSA. However, as noted by the Attorney General, there is a freestanding claim for a violation of the DCSA that is not dependent upon violation of the CSOA. As with the definition of a "supplier" governed by the DCSA, the Defendants offer no argument as to why they could not be held liable for violating the DCSA by making deceptive representations to consumers. Such representations may constitute a "deceptive act" related to a "consumer transaction" as defined by statute if they were intended to convey that the services to be provided had "sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have" or if the services were "of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not." I.C. § 24-5-0.5-3(b)(1), (2).

[39] We conclude that MLG/CAS is entitled to summary judgment on the claim under the DCSA related to alleged violations of the CSOA, but not on the claim alleging an independent violation of the DCSA. McCann is not entitled to summary judgment for DCSA claims related to either the CSOA—because she personally was not exempt from that act—or to the independent DCSA violation.

## Conclusion

[40] MLG/CAS is entitled to summary judgment on the Attorney General's claims against it under the CSOA, the MRPFA, and the HLPA, and as to the claim under the DCSA based upon violations of the CSOA. We reverse the denial of summary judgment with respect to those claims and direct that summary

judgment be entered in MLG/CAS's favor. MLG/CAS is not entitled to summary judgment on the independent DCSA claim for deceptive representations, and we affirm the denial of summary judgment as to MLG/CAS to that extent. McCann personally is not entitled to summary judgment on any of the Attorney General's claims, and we affirm the denial of summary judgment as to her in its entirety. In conclusion, we presume the Indiana Supreme Court Disciplinary Commission is well aware of MLG/CAS's and McCann's activities in this state, given its punishment of Jackson for his association with MLG/CAS.

[41] Affirmed in part and reversed in part.

Robb, J., and Altice, J., concur.